# THE

# MISCELLANEOUS REPORTS

OF THE

## STATE OF NEW YORK

COMMENCING MAY, 1925.

---

STEWART BROWNE, Plaintiff, v. THE CITY OF NEW YORK and Others, Defendants.

WILLIAM JAY SCHIEFFELIN, Plaintiff, v. WILLIAM WIRT MILLS, as Commissioner of Plant and Structures of the City of New York, and Others, Defendants.

Supreme Court, New York Special Term, May 11, 1925.

Constitutional law — home rule amendment — amendment to State Constitution, art. 12, guaranteeing to cities municipal self-government, was validly enacted — entry of concurrent resolution on journals of Senate and Assembly by title and number was in compliance with State Constitution, art. 14, § 1 — proposed amendment of State Constitution, art. 12, § 2, did not affect proposed amendment of entire art. 12 — City Home Rule Law (Laws of 1924, chap. 363) is valid and confers power on city of New York to authorize operation of municipal bus system — said statute does not violate State Constitution, art. 8, § 10, prohibiting expenditure of city funds for other than city purpose — grant of power to operate buses is to city as municipality and not as corporation or private common carrier — certificate of convenience and necessity from Transit Commission not required — local laws passed by New York municipal assembly, and resolutions of board of estimate and apportionment, establishing bus route and making appropriation therefor, are valid.

The entry merely by title and number on the journals of the Senate and Assembly of a concurrent resolution, proposing an amendment to article 12 of the State Constitution guaranteeing to cities the right of municipal self-government, was in compliance with section 1 of article 14 of the State Constitution.

A pending concurrent resolution for the proposed amendment to the entire article 12 of the State Constitution first enacted by the Legislature in 1922, adopted the second time in 1923, and submitted to the people at the general election of the same year, was not nullified by the fact that a concurrent resolution for a proposed amendment to section 2 of the same article was adopted by the Legislature in 1922 for the second time and submitted to the people at the general election in 1922, since, under section 1 of article 14 of the State Constitution, no limitation is placed upon the power of the people to amend pursuant to such provision.

The City Home Rule Law (Laws of 1924, chap. 363), passed pursuant to article 12 of the State Constitution, as amended, is valid and confers power on the city of New York to authorize the establishment and maintenance of a municipal bus system.

Said statute does not violate section 10 of article 8 of the State Constitution, prohibiting the expenditure of city funds for other than a city purpose.

The municipality is not affected by the provisions of the Transportation Corporations Law or the Public Service Commission Law, since the grant of authority is direct through the State Constitution and the City Home Rule Law, and the rights vested are in the city as a municipality rather than as a corporation or private common carrier. The word "corporation," as employed in sections 25 and 26 of the Public Service Commission Law, does not contemplate action by the municipality.

A certificate of convenience and necessity for the operation of a municipal bus system is not required from the Transit Commission, since said operation does not involve the granting of a franchise or the exercise of a franchise right within the meaning of the Greater New York charter or the provisions of the Transportation Corporations Law.

Accordingly, local laws passed by the municipal assembly of the city of New York, pursuant to the authority conferred by the City Home Rule Law, are valid, and resolutions passed by the board of estimate and apportionment, establishing a route for the operation of municipal buses and appropriating funds to carry out such purpose, are valid and their operation should not be enjoined.

MOTIONS to continue injunction *pendente lite* and counter motions to dismiss the complaints.

*Guggenheimer, Untermyer & Marshall* [*Louis Marshall* of counsel], for the plaintiff Stewart Browne.

*Leonard M. Wallstein,* for the plaintiff William Jay Schieffelin.

*George P. Nicholson* [*Bainbridge Colby* and *Frank C. Laughlin* of counsel], for the defendants.

*Robert C. Cumming, William F. McCormack, Clarence M. Lewis* and *John F. Collins,* for the State Home Rule Commission.

*Carl Sherman,* special counsel for the City of Buffalo.

*William Schuyler Jackson,* as *amicus curiæ.*

WAGNER, J.:

The plaintiff as a taxpayer seeks to continue a temporary injunction enjoining the defendants from appropriating and expending the credit and money of the city of New York in establishing a route for a municipal bus line on Eighty-sixth street from the North river to Avenue A and thence along Avenue A to Ninety-second street, from the purchase of vehicles and equipment therefor, engaging in such transportation service generally and more particularly from expending the sum of $135,000 already appropriated for that service through a resolution of the board of estimate

and apportionment adopted January 19, 1925. Relief of a similar nature is coincidentally asked in a suit instituted by one William J. Schieffelin against William Wirt Mills as commissioner of plants and structures of the city of New York and others in which a temporary injunction is also in force restraining the same action. The defendants in each action have made cross-motions for the dismissal of the respective complaints on the ground that their allegations fail to constitute sufficient and recognizable causes of action. The plaintiffs have controverted defendants' proposed undertaking as illegal, assailing their position on separate grounds of attack, and because their claims are so interwoven in their trace to a common source, and the redress petitioned in the form of decrees homogeneous, the subject-matter must be examined from all standpoints in regard to the contentions severally made. The defendants found authorization for their proposal to embark on what they term a governmental project on a claim of legislative and popular sanction of recent acceptance and enactment. On March 17, 1922, a concurrent resolution of the Legislature was passed proposing an amendment to article 12 of the State Constitution relating to cities and villages to the end of regulating legislation concerning them and guaranteeing to them the right of municipal self-government. This resolution was again adopted by the Legislature chosen at the next general election of Senators, pursuant to section 1 of article 14 of the Constitution, on May 4, 1923, and submitted to the people at the following election and by them ratified. The pertinent portions of the amendment are:

" § 2. The Legislature shall not pass any law relating to the property, affairs or government of cities, which shall be special or local either in its terms or in its effect, but shall act in relation to the property, affairs, or government of any city only by general laws which shall in terms and in effect apply alike to all cities except on message from the Governor declaring that an emergency exists and the concurrent action of two-thirds of the members of each house of the Legislature.

" § 3. Every city shall have power to adopt and amend local laws not inconsistent with the Constitution and laws of the State, relating to the powers, duties, qualifications, number, mode of selection and removal, terms of office and compensation of all officers and employees of the city, the transaction of its business, the incurring of its obligations, the presentation, ascertainment and discharge of claims against it, the acquisition, care, management and use of its streets and property, the wages or salaries, the hours of work or labor, and the protection, welfare and safety of persons employed by any contractor or subcontractor per-

forming work, labor or services for it, and the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health. The Legislature shall, at its next session after this section shall become part of the Constitution, provide by general law for carrying into effect the provisions of this section.

" § 4. The provisions of this article shall not be deemed to restrict the power of the Legislature to enact laws relating to matters other than the property, affairs or government of cities.

" § 7. The provisions of this article shall not affect any existing provision of law; but all existing charters and other laws shall continue in force until repealed, amended, modified or superseded in accordance with the provisions of this article. Nothing in this article contained shall apply to or affect the maintenance, support, or administration of the public school systems in the several cities of the State, as required or provided by article nine of the Constitution."

Pursuant to the mandate of section 3 of the amendment, the Legislature of 1924 enacted the City Home Rule Law (Laws of 1924, chap. 363, § 10), conferring upon the municipal assembly of New York city power to adopt and amend local laws with reference to the matters specified in section 11, subdivision 1, " in relation to the property, affairs or government of the city relating to * * * the acquisition, care, management and use of its streets and property * * * the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health." It was further prescribed as follows:

" § 12. Effect of local law on acts of Legislature. 1. Any local law adopted pursuant to this chapter may specify any provision of an act of the Legislature by reference to chapter number, year of enactment, title of statute, section, subsection or subdivision, which provision relates to the subject matter of such local law and does not in terms and in effect apply alike to all cities, and which it is intended to supersede by such local law; and upon the taking effect of such local law, such provision of any such act of the Legislature so specified shall cease to have any force or effect in such city."

" § 30. Legislative intent. It is the intention of the Legislature by this chapter to provide for carrying into effect the provisions of article twelve of the constitution pursuant to the direction contained therein and hereby to enable cities to adopt and amend local laws for the purpose of fully and completely exercising the powers granted to cities by the terms and spirit of such article. It is not the intention of the Legislature hereby to abolish or curtail

any powers or rights heretofore conferred upon or delegated to a city or cities or to any board, body or officer thereof, unless a contrary intention is clearly manifest from the express provisions of this chapter or by necessary intendment therefrom; nor to restrict the powers of the Legislature to pass laws regulating matters of State concern as distinguished from matters relating to the property, affairs or government of cities.

"§ 31. Construction. This chapter shall be construed liberally. The powers herein granted shall be in addition to all other powers granted to cities by other provisions of law."

" § 36. Existing charters and other laws unaffected. All existing charters and other laws relating to the property, affairs and government of cities, and other laws which are subject to amendment or change, pursuant to the provisions of this chapter, shall continue in force until repealed, amended, modified or superseded, in accordance with the provisions of this chapter and of the constitution."

The municipal assembly of the city of New York thereafter formed, in accordance with the act, on January 13, 1925, passed four local laws known as Local Laws 3, 4, 5 and 6 to carry into effect the powers asserted under the City Home Rule Law to institute a system of municipal bus transportation, which received the approval of the mayor.

Local Law No. 3 amended section 242 of the Greater New York charter in relation to the power of the board of estimate and apportionment with respect to the operation of buses, reading as follows:

" (3) In addition to all other powers and duties now conferred upon and vested in the Board of Estimate and Apportionment, such board shall have power to establish a route or routes for the operation of municipal buses in, over, upon, across or along any of the streets, avenues, highways, boulevards, concourses, driveways, bridges, tunnels, parks, parkways, waterways, docks, bulkheads, wharves, piers or public grounds or waters within or belonging to the City of New York and, from time to time, to prescribe the conditions, restrictions and limitations under which the operation and maintenance of municipal buses upon such routes may be had, and, from time to time, to approve of the rates of fare to be charged upon any such route or routes and the character of service to be provided thereon."

The said charter was amended by Local Law No. 4 by inserting a new section known as section 595-a as follows:

" § 595a. In addition to all the powers and duties now conferred upon and vested in the commissioner of plant and struc-

tures by existing laws, such commissioner shall have cognizance and control of the operation and maintenance of municipal omnibuses in, over, upon, across or along any of the streets, avenues, highways, boulevards, concourses, driveways, bridges, tunnels, parks, parkways, waterways, docks, bulkheads, wharves, piers or public grounds or waters within or belonging to the city of New York, when the board of estimate and apportionment shall have established a route or routes for such operation and in conformity with such routes, and subject to such conditions, restrictions and limitations as the board of estimate and apportionment may, from time to time, prescribe. The rates of fare to be charged upon any such route or routes and the character of service to be provided thereon, shall be such as the board of estimate and apportionment may, from time to time, approve."

Local Law No. 5 amended and superseded section 1458 of the charter by providing:

" § 1458. No stage or omnibus route or routes for public use, or any alteration or extension thereof, or any alteration or extension of any existing stage or omnibus route, *except any such route or routes operated or to be operated by any department of the city of New York under authorization of the board of estimate and apportionment,* shall hereafter be put in operation in or upon any street, avenue, park, parkway, bridge or public ground within the city of New York until and unless a franchise or right therefor shall be obtained from the board of estimate and apportionment in like manner as, and subject to the limitations and conditions relating to, franchises or rights in this charter provided and imposed."

Local Law No. 6 amended and superseded section 24 of the Transportation Corporations Law (Laws of 1909, chap. 219, as amd.) to the following effect:

" § 24. Certain persons and corporations subject to public service commissions laws. Any person or any corporation *other than the city of New York, or any department thereof when authorized by the board of estimate and apportionment of such city* who or which owns or operates any stage route in any city of one million inhabitants, or more, shall be deemed to be included within the meaning of the term ' common carrier ' as used in the public service commissions law, and shall be subject to all the provisions of the said law applicable to common carriers."

These local laws were immediately followed by the passage in the board of estimate and apportionment of two resolutions establishing a route for the operation of municipal buses on Eighty-sixth street as above stated and appropriating the sum of $135,000 to the department of plant and structures to carry out the purpose.

These are the understructures of legislation upon which defendants' proposed actions are claimed to be properly supported, and concededly unless the amendment of the Constitution and the City Home Rule Law empower the city itself to engage in this operation and were themselves constitutionally and validly enacted, the stream of local legislation with respect to means and procedure must fall, because impugned at its source.

The first ground of attack against the city's proposal is the claim that the amendment was invalidly enacted and, therefore, never became a part of our fundamental law. It is urged that article 14 of the Constitution was not complied with in two respects:

*First*, that the concurrent resolution for the proposed amendment, although passed by the Assembly and Senate by the requisite majority vote of all members elected to each house, was not entered on the journals of the respective houses as required by section 1 of article 14.

Our Constitution provides (Art. 14, § 1) that "any amendment or amendments to this Constitution may be proposed in the Senate and Assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered *on their journals*, and the yeas and nays taken thereon, ˙* * *."

The question is, was the entry of the resolution on the journal made in accordance with the constitutional requirement, for, undoubtedly, the amendment cannot effect a change unless the procedure defined is observed.

It is undisputed that the concurrent resolution under consideration was not entered at large on the journal but only by its title and number. Such has been the practice of the journal clerks from the beginning. Thus the Legislature have construed the provision as requiring but a descriptive entry. .

It seems to me that an entry on the journal which contains a record sufficient to identify a given resolution is a compliance with the constitutional mandate. Words must be interpreted and understood in their most natural and obvious meaning. A record describing and identifying the proposed amendment is an entry as popularly understood and intended.

If it was intended that the entry should be of the resolution in full it would have explicitly so provided as it does with reference to the Governor's objections to a bill. It is required that such objections must be entered *at large* on the journal. (Art. 4, § 9.) The omission of the words "at large" or "in full" in section 1, article 14, is significant and persuasive.

It would serve no useful purpose to review in this opinion the

**8** BROWNE *v.* CITY OF NEW YORK.

decisions of the courts in other jurisdictions on this precise question. The great weight of authority supports the rule that an identifying reference is a full compliance with a constitutional requirement that a resolution be entered on the journal. (*Ex parte Ming*, 42 Nev. 472; *Boyd* v. *Olcott*, 202 Pac. 431; *State* v. *Herried*, 72 N. W. 93; *Prohibitory Amendment Cases*, 24 Kans. 700, 710; *Matter of Senate File No. 31*, 25 Neb. 864; *Oakland Paving Co.* v. *Tompkins*, 72 Cal. 5.)

In the *Herried Case* (*supra*) the court said regarding the meaning of the words *entry on the journal:* " Not having added the words ' at large,' it is reasonable to infer that it was intended to allow the legislature the liberty of adopting either method of entry. In any event, language was employed which courts of the highest respectability have held to warrant either an entry in full or by an identifying reference."

*Secondly,* it is claimed that because a concurrent resolution for a proposed amendment to section 2 of article 12 was adopted for the second time by the Legislature of 1922 and submitted to the people and adopted by them at the general election of 1922, this nullified the pending concurrent resolution for the proposed amendment to the entire article, which was first adopted by the Legislature of 1922 and was adopted for the second time by the Legislature of 1923 and then submitted to and adopted by the people at the general election of that year. The point requires examination of section 1, article 14, regulating the method of amendment. This provision places no limitation upon the power of the people to amend pursuant to its requirements. The pendency of a proposal is nowhere stated or inferred to constitute a bar to or deprivation of the right of the people of the State to vote upon one subsequently and perhaps more imperatively demanded. No interim of suspension or abeyance is commanded. To read its necessity into the section would itself be a novel and additional method of amendment. I view the contention as without merit.

Starting with the assumption that the amendment became part of the Constitution in compliance with the mechanical means therein provided, it is contended that even an express authorization by the Legislature to the city of New York to purchase and operate buses would be violative of article 8, section 10, of the Constitution which prohibits the expenditure of city moneys except for a city purpose and further that chapter 363 of the Laws of 1924, otherwise known as the City Home Rule Law, cannot and does not authorize the enactment by the municipal assembly of the city of New York of Local Laws Nos. 3, 4, 5 and 6. Their point is that since the municipal assembly derives its power to legislate from the act which,

in turn, by repetition of verbiage in its controlling sections is dependent upon an exercise of power to be found in the amendment, the latter must authorize the action here sought to be enjoined. The defendants' rights, if any, there emanate, and all subsequent authorizations are but necessary means toward its adaptation.

The constitutional amendment and act read together force this conclusion. The powers of the Legislature to enact general laws and of the city to pass local ones are definitely set forth and the point where encroachment upon each takes place made theoretically certain.

The Legislature may act with reference to the property, affairs or government of cities (hereinafter referred to as city affairs) only by general law applicable in terms and effect to all the cities of the State alike. As to matters enumerated in section 3 of article 12 and section 11 of the City Home Rule Law, each city may itself adopt and amend local laws relative to its affairs. Each city may, by local law, supersede a State legislative provision relating to it which does not apply alike to all cities, except that no local law may supersede a legislative act whether or not it applies in terms and effect to all the cities if such State legislation relates to matters other than city affairs, and the validity of local laws enacted by the city equally hinges on the question whether or not their subject-matter concerns its affairs.

Let us examine the amendment to ascertain the existence or nonexistence of the power questioned. It alone constitutes the ambit within which it must lie. It is said that precedents estop the inquiry. Whether a binding foreclosure has taken place necessitates their re-examination. *People ex rel. Einsfeld* v. *Murray* (149 N. Y. 367) is mentioned as conclusive. There the Liquor Tax Law (Laws of 1896, chap. 112) was attacked as unconstitutional upon the ground that because of its special provisions applicable to certain cities of the State, it had not been sent to the mayors of those cities for approval or rejection in accordance with the requirement of old section 2 of article 12. The Court of Appeals held that the provision differentiating between the city of New York and other cities was not invalid on that ground for the reason that the act was not a general or special city law but a general State excise law. Though the law contained some special provisions adapted to particular localities, in effect and purpose it had State-wide application. Its adjustment of details, though not uniform, did not distort its general scheme and scope.

Equal emphasis is placed by plaintiffs upon *Admiral Realty Co.* v. *City of New York* (206 N. Y. 110) and *Matter of McAneny* v. *Board of Estimate* (232 id. 377), which attacked as unconsti-

tutional respectively the Rapid Transit Act and an amendment to
the Public Service Commissions Law creating a transit commission
for cities containing more than 1,000,000 inhabitants.

The former expressly conceded that provision for the trans-
portation of passengers within a municipality was inherently a
city affair by adopting as incontestable the former holding of that
court that the construction of subways by a municipality was a
city purpose. (*Sun Printing & Publishing Assn.* v. *Mayor, etc.,* 152
N. Y. 257.) It decided, however, another proposition, that because
a general statute it did not require the approval of the mayor.
The latter (*Matter of McAneny* v. *Board of Estimate, supra*), fol-
lowing the *Admiral* case, reiterated its declaration that the act there
in question was a general rather than a special city law, since it in
terms applied to all cities of 1,000,000 or more and that the city
was required to make the appropriations demanded. Whether con-
structing and operating municipal subways was a municipal or a
State affair it was unnecessary to decide and the dicta of the individ-
ual judge writing to the contrary is uncontrolling. In other words,
both cases support the finding that although the matter be one
relating to the city's affairs, such matter had been dealt with by a gen-
eral law applying to all cities of a class. It might first be remarked
that old section 2 of article 12 of the State Constitution upon which
they were founded has been supplanted. Now not alone do the
terms of the statute govern the kind of the legislation but the effect
is equally determinative of its type. What is important is that we
are not concerned with the question whether such laws under the
amendment would still be held general though the court is decidedly
inclined toward the contrary view, but whether under the new article
transportation by buses is a municipal affair. There is no general
law now before me either to construe or to determine as possibly
infringing upon local municipal government. The question is
simply whether a distinctly local bill involves a local affair.

At the time those decisions were rendered the city as a creature
of the State could not constitutionally legislate upon these subjects
for itself. It was required to seek authorization from the Legis-
lature. When it did, usually instead of receiving an act specific
it received one of general and multiple application. The bills
here are special in character and effect. Those decisions, therefore,
are in no wise binding here and in fact if not expressly by the
clearest implication indicate the legality of the powers here invoked.

A comparison between the amended article and its predecessor
is instructive in this respect. While the present article standing
alone may be considered as indefinite and vaguely broad, in our
search for the circumscription of its power, its full significance

cannot be appreciated unless read in connection with section 3 thereof, where regarding local legislation the grant is definite and specific. Realizing that by the limitation of that section the local laws must be consistent with the Constitution and the general laws of the State, the limitation of section 2 as to the affairs and government of the city is impliedly incorporated by the rule of interpretation requiring provisions in *pari materia* to be so construed as to give possible effect to all and that, in fact, the same phrase has been made a condition precedent in the City Home Rule Law, the question really resolves itself into whether or not the operation of a municipal bus system involves an affair or government of a city in respect to " management and use of its streets." For the first time, therefore, is found in the amended article a disclosure that the matters itemized in section 3 are such as may, if included within the limitation of section 2, be the subject of local control by enactment. The delineation is especially significant in denying to the former interpretation of the phrase any conclusive effect it might otherwise possess. Its inclusion must have been purposeful. Fortunately, the method of interpretation to be applied by the court is free from doubt. By the injunction of our court of last resort it is to be approached in a liberal spirit. " It will be the duty and we have no doubt the pleasure of the court, on a proper occasion, to give full effect to this new provision of the Constitution [referring to a former provision of the same article], and to construe it with that liberal spirit which is especially required in the interpretation of a remedial provision of the fundamental law, so that, if possible, it shall be efficient to secure the purpose of its enactment." (*People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367.)

The doctrine is not a novel one. The court was committed by its prior decision in *Ayers* v. *Lawrence* (59 N. Y. 192), where it observed: " In the construction of laws of the character of that under consideration, too much stress should not be laid on the strict and precise signification of words but they should be construed liberally, with a view to the beneficial end proposed, to wit, suppression of the mischief and advancement of the remedy."

This section is an entirely new one in the Constitution. As such it is unshackled by decision and not obscured by dicta. It is certain that rights are granted which cities did not heretofore have. The Constitution secures to them whatever those rights may be without hindrance.

What they are would require too extensive an exposition in this opinion and prove, in most respects, academic and extra-judicial. It is sufficient to examine the precise question presented. Aid is to be found in a survey of its history and a correct knowledge of the

Supreme Court, May, 1925.        [Vol. 125

intention and purposes of those who by concurrent resolution and popular vote made it a part of our basic law. We were remitted to the situation in 1913 when the so-called Home Rule Law was enacted by the Legislature of that year to ascertain the state of mind underlying it in *Brooklyn City R. R. Co.* v. *Whalen* (191 App. Div. 737; affd., 229 N. Y. 570). The same process of interpretation now exacts an understanding of the popular will when this amendment was adopted. It requires appropriate legislation to convey its powers. That legislation expressly and clearly as words can convey by its title and caption discloses the intention that it was contemplated to confer the broadest right of local self-government. If that is so, this power is but placed in its original seat. Before the State was created and the city became its creature, the power of self-government existed locally. We have now reached the point of departure. That power once delegated has, by consent, been regained.

The reasons for this reassumption are numerous and of such common knowledge that courts may properly take judicial notice of them. The cry against continued retention by the State of control over and management of purely local affairs had become widespread and insistent. Acts general in form but intended to be applied to but a single locality frequently displaced the popular will and were foisted upon unwilling recipients over the protest of its legislative representatives and elected officials.

Even the infrequent grants made by a State Legislature were but coterminous in time with the State's will. Subject to revocation or change they possessed neither stability nor permanency. The charter contract could be varied whenever State interference desired to stifle or embarrass local authority and administration of details rightly belonging to local rather than general policy. Whenever a municipality desired to assume a new governmental function purely local in character it required an appeal to the State Legislature. Its grant or denial rested upon the decision of representatives far removed from the city and uninformed as to its needs. The decision to grant or withhold the power sought frequently depended upon whether the constituency effected was politically in sympathy with the majority of the Legislature rather than upon the merits of the proposal.

The Session Laws are replete with instances of local laws manifestly imposed upon the people effected against their will. The conditions appeared to them as intolerable, and aroused public feeling to the extent of a defined movement toward the right of self-determination evinced by gradual statutory changes and reaching its peak in the adoption of the amendment under consideration.

The agitation first brought about the provision in the Constitution of 1894 (Art. 12, § 2) where cities were subdivided into classes and special laws called for the approval of the mayor or other local authority. Notwithstanding such disapproval the proposed law could still be enacted by a majority vote of the Legislature. While serving as a check to some extent on State intrusion it entirely failed to vest the cities with power.

Prof. McBain, in his work " The Law and Practice of Municipal Home Rule," informs us that in the first nineteen years following its adoption 143 special acts relating to cities were passed over the heads of the cities affected, the extent of the domination manifesting itself in the facts that the act which consolidated New York city became a law without the approval of the mayors of the cities involved, that the charter of the city took effect without such approval and that the Public Service Commissions Law was actually vetoed by the mayor.

Equally unworkable and devoid of relief was its successor, the so-called Home Rule Law passed in 1913, now article 2-A of the General City Law. It proved inadequate to confer what was intended. The limitations of the Constitution intervened. It was said, and correctly so, that only a constitutional amendment could remove them. In 1914 came the Optional City Government Law (Laws of 1914, chap. 444) permitting cities by popular vote to adopt any one of several forms of municipal government prescribed in the act. It too was unfruitful in result and the insistence for local control continued. It voiced itself again on the floor of the convention for the revision of the Constitution in 1915, was gravely and deliberately there discussed and an amendment formulated in the proposed new Constitution affording a measure of relief. The defeat of the revised Constitution carried with it the failure of the home rule proposal. Amelioration was no nearer. In rapid succession concurrent resolutions to the same purpose, differing in that they increasingly enlarged the grant of local power, appeared at the subsequent legislative sessions. Success was thought to have been obtained by the adoption of the amendment in the election of 1923 and the enactment of the City Home Rule Law in the succeeding session.

Mainly and specifically as the basis of this agitation and one of the chief sources of complaint was the inadequacy of present day accommodations and means for the transportation of persons within cities. We as courts are not bound to close our eyes to what as men we know. As early as 1860 the Legislature began to grant perpetual franchises for the use of city streets. When the belated amendment of 1874 to the Constitution of 1846 (Art. 3, § 18) took

effect, total invasion had already occurred. Witnessing the presence of popular demand still continuing under the later amendment (Art. 8, § 10) rapid transit was recognized as one of the purposes for which the city of New York was permitted to incur indebtedness for any amount within its borrowing capacity. This resulted in the present municipal ownership of the subways and the city's admitted right to operate them.

Even this relief was partial. The affording of complete facility for travel was still hampered. Other obstacles and hindrances were strewn in the way. Various boards of railroad, transit and public service commissions existed, not the offsprings of the locality. Their consent to solution was imperative. Differences of opinion on questions of policy and advisability with consequent delay were the natural rather than unusual consequences.

Dissatisfied with this dual control of matters pertaining exclusively to local transportation and recognizing the home rule amendment as a corrective the people by an overwhelming vote adopted the same.

Indeed, it may be unnecessary to observe that this interest in New York State was but a phase of a similar current of interest in the country at large. Many States have passed through the same uphill experiences before the will of their people was finally recognized in enforcible form. Not the last have been our own courts in its appreciation. In referring to the Optional City Government Law of 1914 it was said: " The whole trend of modern thought and recent legislation is toward vesting in each municipality the management of its local affairs." (*Cleveland* v. *City of Watertown*, 222 N. Y. 159.) And later in *Schieffelin* v. *Hylan* (236 N. Y. 254) the same progressive view was exhibited where the court announced the doctrine that in determining whether an act of a given nature comes within the constitutional definition of a city purpose, courts may and will take notice of widespread opinion and general practice which have come to regard as a city purpose something which might not be such by absolute necessity or on a narrow interpretation of the Constitution.

The City Home Rule Law passed by either the same legislators or those cognizant of or under the same influences, as the representatives who formed and passed the prior resolution, by its title, the definiteness of its provisions and their clear implications equally exhibits that it was meant to be what its name indicated, a grant of local power of legislation.

Again, convincingly indicative of the spirit behind the constitutional change, and in fact its accelerating motive, was the prior unsuccessful attempt to institute this identical undertaking

which met frustration at the hands of the courts.˙ In 1919 under the former Home Rule Act, *and without any corresponding change in the Constitution,* the city of New York attempted to acquire and operate municipal buses to relieve congested conditions of traffic and travel upon the public streets. The city's proposed action was enjoined. (*Brooklyn City Railroad Co.* v. *Whalen, supra.*) The forbiddance by section 1458 of the charter of their operation without a franchise was the reason for the decision. That alone completely disposed of the issue. The court's other expressions were dicta. The affirmance was without opinion by the Court of Appeals and but answered the certified question whether the complaint stated a cause of action for an injunction. The other questions which the court below discussed and which were certified were avoided upon the ground of non-necessity. But even its dicta are not bars. It distinctly said that in referring to local affairs those only could be viewed as such as were so regarded when the act was passed in 1913. The question here is whether they have not taken on a new content and meaning in 1923.

Moreover, the apprehension expressed in the opinion that were it held that a system of municipal buses could be legally operated by the city, by the same token the municipality would be authorized to conduct a department store, would seem more fanciful now than real in view of, *first,* the constitutional restriction upon expenditures of the city's funds for other than municipal purposes, and *second,* in view of the specific enumeration of those purposes set forth in the new section 3 of article 12. Differently stated, the probabilities are wholly opposed to an argument of casual coincidence when it is observed that the objects mentioned in the former statute were not alone included but considerably enlarged in the amendment and thereafter conferred verbatim by the enabling act.

The purpose of the change becomes manifest when the definite restrictions contained in section 21 of the City Home Rule Law entirely fail to mention or exempt municipal bus operation theretofore prevented by the decision above referred to. Were it intended otherwise its inclusion could have been readily made when it is considered that at recurrent legislative sessions prior to the amendment's adoption constant attempts were made to procure this very permission from the State.

It is further urged that this court adopt a progressive view in harmony with the spirit of the times. I would be unreluctant on that point were it one of proper consideration. The case does not, to my mind, involve the change of any rule of law, the excision of any growth contrary to the demands of justice or an attempted correction of any principle based upon an erroneous footing. It

compels no restatement. It does compel a finding whether or not there is a reflection of an intention in the new legislation to change the theory of local government. The only duty, therefore, devolving on the court is to interpret the purpose and aim at their base, the intent of the proposers and of the people whose adoption made them a declaration of their aims. As to that duty prior enunciations of supposed intent at times still more antecedent are profitless. The question arises anew as the provisions of any contract. Historical approach is only availing to disclose an original intention and its subsequent changes, not to chain it fixedly for all times to what once it may have been declared to have been. Words are after all but symbols conveying the state of mind of the utterer. The process of accretion and erosion find them fit subjects, and their import is not nor can be of rigidity. As was well said in the case of *Laughlin* v. *City of Portland* (111 Maine, 486, 491): " Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual effort may vary * * *. What was clearly a public use a century ago, may, because of changed economic conditions, have ceased to be such today. * * * Laws which were entirely adequate to secure public welfare then may be inadequate to accomplish the same result now."

When, therefore, we consider the popular state of mind at the time of its adoption, the definite prevailing public opinion in analogous and collateral matters, the evident intent to overcome and circumvent previous obstructions, the sole purpose to transport passengers within local limits, the liberty enjoined upon interpretation, and the obvious purpose of overcoming the restrictive decisions referred to, I am to interpret the amendment as all compacts and agreements are to be construed, according to the intention of the parties and what they designed its provisions to mean at the time of acceptance. Applying that rule the authority of the former decisions bows to the changed content of meaning. I hold that the Constitution now permits the Legislature to confer the right here sought to be enjoined, as one pertaining to the property, affairs and government of the city. Another conclusion would constitute a thwarting of the popular will, a destruction of delegated power, a confusion of that power with policy and a step toward judicial superiority over the Constitution to expound and interpret and not to make which is the duty of the court.

It remains to consider whether the power recognized in the amendment has been granted over by the enabling act. Declaratory and not self-executing the Legislature must give it effect. Conceding that the power has been generated we inquire as to the fact

of transmission. The preceding statute of 1913 (General City Law, art. 2-A, as added by Laws of 1913, chap. 247) unaccompanied by any emancipatory constitutional provision was narrow in comparison. It empowered the city " to lay out, establish, construct, maintain, operate, alter and discontinue streets," and was the provision which *Brooklyn City R. R. Co.* v. *Whalen* (*supra*) referred to and construed. There is, however, a broader relinquishment of State supervision in this. The extension is manifest when the two are viewed together. Possessing all of the old, the new is widened in sphere and influence, " the acquisition, care, management and use of its streets." (City Home Rule Law, Laws of 1924, chap. 363, § 11, subd. 1.) " Management " implies a discretionary power of direction other than regulation of a police nature already conferred. " Use " implies the application of the management. The former term is one relating to guidance and control, the latter to actual utility and performance. One precedes the other as the purpose precedes the act. But to what purpose is the grant of the use of its streets to a municipality? Two practically can be conceived; for the purpose of the conduct of the city's business and of its citizenry in general. Theoretically, they merge into one. Convenience of travel and transportation interests the one, provision therefor the other. The duty of provision exists for the benefit of the former and the latter is indeed but the administrative means of converting the demand into the fact. If the pre-existing retention by the State of this control has been abandoned and a transfer been made, I apprehend no expression of general grant in that respect more suitable and adequate to include means of transportation than that employed in the amendment and reincorporated in the act. Confirmation is not wanting in the expressions of both the Legislature and the courts. It has been authoritatively held that the transportation of passengers within a city is a city purpose and thus a municipal affair. The Appellate Division said in *Sun Printing & Publishing Assn.* v. *Mayor* (8 App. Div. 230; affd., 152 N. Y. 257):

" Where, then, shall we draw the line? It would be very simple to draw it as those purposes for which precedent in the past can be found, and to exclude all others. This test should be easy of application, but would be essentially vicious and erroneous. Growth and extension are as necessary in the domain of municipal action as in the domain of law. New conditions constantly arise which confront the Legislature with new problems. As the structure of society grows more complex, needs spring up which never existed before. These needs may be so general in their nature as to affect

the whole country or the whole State, or they may be local and confined to a single county or municipality. In any case, it is the duty of that legislative body which has the power and jurisdiction to apply the remedy. *  *  *

"The true test is that which requires that the work shall be essentially public and for the general good of all the inhabitants of the city. It must not be undertaken merely for gain or for private objects. Gain or loss may incidentally follow, but the purpose must be primarily to satisfy the need or contribute to the convenience of the people of the city at large. Within that sphere of action, novelty should impose no veto. Should some inventive genius bye and bye create a system for supplying us with pure air, will the representatives of the people be powerless to utilize it in the great cities of the State, however extreme the want and dangerous the delay? Will it then be said that pure air is not as important as pure water and clear light? We apprehend not. The illustration may seem fanciful today, but who shall say that peculiarly local conditions may not arise which will make it a vital question hereafter?

"The health of the people is dependent in a measure upon decent and convenient transit between their homes and their places of business; not in as great a degree as upon light, air and water, but in no inconsiderable degree. The scheme under consideration is intended to supply not only rapid, but such decent and convenient transit; to ameliorate the present congestion which at certain hours of each day is fraught with danger to thousands, and to furnish business men and women with the means of reaching their homes at such hours without being crushed in body or worn in nerve. *  *  *

"It is not the province of the court to deny the legislative power to thus adjudge. The present enterprise was demanded of the city by the surrounding conditions. It was a public enterprise. It was not for travelers nor for public travel in the ordinary sense. It was for daily and hourly use in the business and home life of our people. *It was entirely within the boundaries of the city.* It was primarily for the benefit of its long-suffering inhabitants alone. It was to be open to all these inhabitants at a toll to be fixed by public officials. It was not tainted with even the suggestion of a private character, nor with the purpose of gain. The sole object was public and general locomotion in the locality — locomotion for which there was a crying need — safe, rapid, healthful locomotion; locomotion worthy, in fine, of a civilized metropolis and of a well-governed municipality."

Tracing its course to the Court of Appeals (*Sun Printing &*

*Publishing Assn.* v. *Mayor* (152 N. Y. 257, 264, *et seq.*) that court was no less approving in its declaration of affirmance when it said:

" The Constitution (Art. VIII, § 10), among other things, provides that, ' Nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes.' Is the building of the proposed railroad a ' city purpose ' within the meaning of this provision? We are aware that the expenditures of our city governments have become enormous, and that appropriations have been made for a great variety of purposes, many of which may be open to criticism, and that a complete definition of ' a city purpose ' may not be possible, in view of the fact that reasons may arise which we are unable to foresee or now consider. * * *

" Generally, we think, the purpose must be necessary for the common good and general welfare of the people of the municipality, sanctioned by its citizens, public in character and authorized by the Legislature. Common highways have always been regarded as under the special care, supervision and control of municipal governments, upon which devolves the duty of keeping them in suitable repair as well as the duty of providing sufficient ways to satisfy the requirements and answer the convenience of the public. Highways are not only necessary for the welfare and convenience of the people, but are required by them. They are public in character and authorized by the Legislature. * * *

" Is such a highway for ' a city purpose? ' We are aware that under another provision of the Constitution, which we shall consider later on, municipal governments are prohibited from loaning their credit to a railroad corporation, but this does not apply to a railroad constructed and owned by the city or affect the character of the use or the purpose for which it was constructed. Common highways are clearly within the provisions of the Constitution for a ' city purpose.' Railroads, as we have shown, are highways and constructed for the same purpose as the common highways. They are necessary for the common welfare of the people, required for their use, public in character and authorized by the Legislature, and when constructed and owned by the city are for a ' city purpose ' within the meaning of the Constitution."

There is, therefore, the highest judicial authority for the proposition that the construction and operation of subways for the transportation of passengers by the city is one intimately connected with the city's affairs. (See, also, *Admiral Realty Co.* v. *City of New York, supra.*) In the former case the court was forced to overcome objections which here do not appear. The charging of a fee for passage was argued as distinguishing a subway from a

common highway. The court referred to turnpike and plank roads where tolls were charged, holding " yet they were public highways." It was objected that the road was wholly occupied by rails so as to prohibit its use by vehicles and travelers. It was answered that " highways are often constructed for different uses." It would seem difficult to logically claim that where a street in its entirety might be rightfully pre-empted from any other use than that of the special means of transportation peculiarly adaptable, when adapted for other than a single use, it could not partake of both. And less so, that the right to create does not necessarily carry with it the right to use when already in existence.

Streets are as the arteries and veins of the man. (*Perrysburg* v. *Ridgway*, 108 Ohio St. 245.) It follows that the type of mechanism employed is immaterial if suitable as an instrumental factor in securing the end. Ocular proof is abundant as to the convenience of the system as well as the desirability of its extension. In fact the certificate of convenience and necessity heretofore required by the Public Service Commission Law attests a clear legislative intent and admission long prior to this amendment that this method of transportation was a valid and suitable use of the streets, and a like admission even as to municipal operation itself by the then statute law. That power pre-existed the amendment though dependent upon certain conditions.

A claim, therefore, of novelty or extraordinary character of the project contemplated can hardly survive, and I take it that the power now attempted to be carried out by the city was created by the amendment and pursuant thereto has been conferred upon the city by the Legislature. Since the transportation of passengers by buses owned and operated by the city is for the above reasons a use of its streets relating to its affairs within the contemplation of the Home Rule amendment, there is no legitimate basis of attack against the four local bills enacted by the municipal assembly of New York making provision for such a system of operation.

Local Law No. 3 vests the right in the board of estimate and apportionment to establish the routes.

Local Law No. 4 places the control and operation of whatever routes are established in the department of plant and structures of the city.

Local Law No. 5 amends and supersedes in part the former provisions of section 1458 of the Greater New York charter, exempting such operation from the requirement of a franchise as a prerequisite.

Local Law No. 6 supersedes the part of section 24 of the Transportation Corporations Law requiring a common carrier to obtain a certificate of convenience and necessity by exempting the munici-

pality from compliance with that requirement in its operation of such system.

These bills make inherent and primary what were before secondary and derivative rights. Without awaiting the determination of a private franchise, they empower the city to do immediately what it heretofore could have done only after termination.

The right it possesses to-day is unhampered by external supervisory or discretionary conditions. Empowered to act it now needs no further grant. The possession of the right would be qualified rather than absolute, were it necessary to go through a ceremony of grant of franchise.

There are authorities which illustrate the distinction between a franchise to a private concern and the direct operation of a municipal function. It is pointed out in *Trustees of Southampton* v. *Jessup* (162 N. Y. 122); *Trenton* v. *New Jersey* (262 U. S. 182); *East Hartford* v. *Hartford Bridge Co.* (10 How. 511).

Local Law No. 6 would appear as an excess of legislative caution, unnecessary because neither the system nor the former bills infringe on any provisions of laws therein referred to. The municipality is not affected in any way by the Transportation Corporations Law or the Public Service Commission Law.

The rights here vested are upon the city as a municipality, not as a corporation or private common carrier. The grant is direct, through the Constitution and the City Home Rule Law rather than by means of or through the Public Service Commission Law. Neither of the two laws above mentioned applies to the municipality. Sections 24 and 25 certainly do not contemplate action by the city for both these sections have reference to " any person or any corporation who or which owns or operates " a stage route, bus line, etc., in any city.

A strained construction would have to be given the word " corporation " to include the city, when we find it used in both sections with the latter term employed in a different sense. (See *Sun Printing & Publishing Assn.* v. *Mayor,* 152 N. Y. 257, where it was held that the city of New York was not a corporation within the meaning of article 3, section 18, of the Constitution.) Nor is it a railroad corporation within section 53 of the Public Service Commission Law, nor a common carrier specifically defined under section 2, subdivision 9, thereof.

Since the establishment and operation of this system does not involve the granting of a franchise or the exercise of franchise rights within the meaning of the Greater New York charter and of the Transportation Corporations Law, no certificate of convenience and necessity is required from the Transit Commission, and the bill is

but declaratory of the law. In any event and however considered the right of supercession would validate the bill.

I am not called upon to set the boundaries of power conferred by the amendment and enabling act. That they are expressive of a long, continuously voiced and deliberate demand admits of no contradiction. That they represent the progressive thought of governmental policy cannot be questioned. Likewise whether the proposed city venture is wise or should be confined to individual enterprise are questions of political and governmental policy. These questions must be determined by the elected officials to whom the people of the municipality have intrusted the administration of their affairs.

It seems, therefore, that the people by express constitutional warrant and the representatives of the people by direct legislative authorization have empowered the city to do the very thing which the plaintiffs seek to enjoin. The intent of both the people and the Legislature clearly appears. In both instances it is an intent influenced and dictated by history, controversy, experiment, litigation, struggle, defeat. All these influences are reflected in this intent. In order to find another meaning we must disregard the history of the home rule question in this State, we must misinterpret the legislative controversies of the last quarter century, we must discredit the annual declaration of political parties, we must discount the persistent pretensions and the bitter struggles of cities for self-government, and we must nullify the purpose of a long-sustained popular agitation for city home rule. These considerations being present to the minds of the people they adopted the constitutional amendment. In the popular mind it was a municipal bill of rights, a full, complete and unrestricted charter of free municipal action, which, were the court to sustain the contentions of the plaintiffs, would be converted into an unsubstantial formula of ministerial conduct and a mere shadow of what the people intended to be a broad progressive policy of independence in municipal government and municipal enterprise.

Motions for injunctions *pendente lite* denied.

Motions to dismiss granted.