Stewart Browne, Appellant, *v.* The City of New York and Others, Respondents.

William Jay Schieffelin, Appellant, *v.* William Wirt Mills, as Commissioner of Plant and Structures of the City of New York, and Others, Respondents.

First Department, July 6, 1925.

Constitutional law — amendment to State Constitution — Constitution, art. 14, § 1, relating to amendments must be strictly observed — amendment to article is invalid under Constitution, art. 14, § 1, if same article is amended on prior proposal between first and second passage of proposed amendment by Legislature — amendment to article is not valid unless article is same when amendment is adopted by people as it was when proposal was first passed by Legislature — alleged amendment revising art. 12 adopted by people in 1923, is invalid, since amendment of § 2 of that article was adopted by people after first and before second passage of revising amendment — contention that prior illegal action by Legislature in submitting proposed amendments to people is practical construction of Constitution is unfounded — amendment is not valid if proposed amendment as passed by Legislature is not entered in full in journals of both houses and yeas and nays taken thereon — City Home Rule Law (Laws of 1924, chap. 363) and Local Laws passed by city of New York under authority of alleged Home Rule amendment are invalid — taxpayer of city of New York has right under General Municipal Law, § 51, to maintain taxpayer's action to restrain city from expending money under Local Laws relating to municipal buses adopted in pursuance of supposed power contained in said amendment — city of New York cannot operate municipal buses by virtue of anything contained in City Home Rule Law (Laws of 1924, chap. 363).

The provisions of section 1 of article 14 of the State Constitution, regulating the manner of proposing, submitting and adopting amendments to the Constitution,

are mandatory and must be strictly followed in order that any proposed amendment may be valid.

An amendment to an article of the Constitution, although passed by two Legislatures, chosen at separate elections of Senators, and adopted by the people is null and void under section 1 of article 14 if, between the time when the proposal to amend was passed by the first Legislature and the time when it was passed by the second Legislature, the same article was legally amended under a prior proposal properly submitted to and adopted by the people. An amendment is not valid unless the article amended is the same in every respect at the · time the amendment is adopted by the people as it was when the proposal to amend the article was first passed by the Legislature.

Accordingly, the City Home Rule amendment which purported to revise article 12 of the Constitution, which amendment was ratified and adopted by the people at the general election in the fall of 1923, is null and void, since it appears that section 2 of that article was amended by an amendment adopted by the people in the fall of 1922, which became effective on January 1, 1923, and that, therefore, article 12 was not the same article when the Legislature passed for the second time the proposed City Home Rule amendment as it was when that amendment was passed the first time.

The contention that, because the procedure adopted by the Legislature in reference to the City Home Rule amendment has been resorted to heretofore by the Legislature in submitting certain constitutional amendments for adoption, a practical interpretation of the Constitution in that regard was thereby established, is without merit or foundation in law, for any illegal action on the part of the Legislature in violating the organic law of the State will not render a subsequent and similar violation of the Constitution valid and is not binding upon the court.

The City Home Rule amendment is invalid for the further reason that the proposed amendment was entered on the journals of both houses by title and numbers only, whereas, under section 1 of article 14 of the Constitution, it should have been entered on the journals in full with the yeas and nays.

Since the City Home Rule amendment to the Constitution was not legally adopted, the City Home Rule Law (Laws of 1924, chap. 363) and Local Laws passed by the city of New York under the authority of the alleged Home Rule amendment are invalid and have no force or effect whatever.

A taxpayer of the city of New York has the right, under section 51 of the General Municipal Law, to maintain a taxpayer's action to enjoin the city from expending money for the purpose of establishing municipal buses, under the assumed power contained in the City Home Rule Law and the Local Laws passed by the city of New York thereunder.

The contention that regardless of the validity of the amendment to article 12 of the Constitution, the provisions of the City Home Rule Law which was subsequently enacted, so far as they are not dependent upon that amendment, are valid and confer full authority upon the city to operate municipal buses is not sustained, for the city did not receive from the Legislature such authority under any of the provisions of the City Home Rule Law.

APPEAL in the first above-entitled action by the plaintiff, Stewart Browne, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 15th day of May, 1925, granting defendants' motion to dismiss the complaint upon the ground that

it does not state facts sufficient to constitute a cause of action; also from a judgment entered in said clerk's office on the 16th day of May, 1925, pursuant to said order dismissing the complaint, and also from an order entered in said clerk's office on the 15th day of May, 1925, denying plaintiff's motion for an injunction *pendente lite*.

Appeal in the second above-entitled action by the plaintiff, William Jay Schieffelin, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 15th day of May, 1925, granting defendants' motion to dismiss the complaint upon the ground that it does not state facts sufficient to constitute a cause of action; also from a judgment entered in said clerk's office on the 16th day of May, 1925, pursuant to said order dismissing the complaint, and also from an order entered in said clerk's office on the 15th day of May, 1925, denying plaintiff's motion for an injunction *pendente lite*.

The opinion of the Special Term is reported in *Browne* v. *City of New York* (125 Misc. 1).

*Guggenheimer, Untermyer & Marshall* [*Louis Marshall* of counsel], for the appellant Stewart Browne.

*Leonard M. Wallstein* [*Ralph M. Frink* with him on the brief], for the appellant William Jay Schieffelin.

*George P. Nicholson,* Corporation Counsel [*Frank C. Laughlin* and *Bainbridge Colby* of counsel], for the respondents.

*Frederick C. Rupp,* Corporation Counsel [*Carl Sherman* of counsel], for the City of Buffalo, intervenor.

BURR, J.:

The action brought by Stewart Browne is a taxpayer's action to enjoin the city of New York and its officials from using public funds for the establishment and operation of a municipal bus line on Eighty-sixth street, from the North river to Avenue " A," and thence along Avenue " A " to Ninety-second street.

The defendants, before answering, made a counter-motion returnable at the same time as plaintiff's motion for the continuance of an injunction granted *ex parte*, for the dismissal of the complaint on the ground that the facts alleged do not constitute a cause of action.

These two motions and a motion for the continuance of an injunction in a like action brought by William Jay Schieffelin, plaintiff, appellant, against William Wirt Mills, as commissioner of plant and structures of the city of New York, and others, and a like

motion by the defendants in that action for the dismissal of the complaint therein, were heard together. The two appeals in the Browne action were argued together at the same time as like appeals in the Schieffelin action.

The complaint in the Browne action is based upon four principal grounds, namely:

I. It was adjudged in *Schafer* v. *City of New York,* the findings and decrees in which are incorporated in the complaint in this action, that prior to the attempted passage of the City Home Rule Law, enacted under the alleged authority of article 12 of the Constitution, as amended, the defendants had no right to use the money or credit of the city of New York for any purposes sought to be enjoined in this action.

II. The only authority for the so-called Local Laws Nos. 3, 4, 5 and 6 of the New York Local Laws of 1925 and for chapter 363 of the Laws of 1924 (Consol. Laws, chap. 76) being article 12 of the Constitution, as it is claimed to have been amended in 1923, if the alleged amendment was not adopted in conformity with article 14 of the Constitution, then chapter 363 of the Laws of 1924 and the Local Laws in question would be null and void and the decision in *Schafer* v. *City of New York* would be controlling.

III. The alleged amendment of article 12 of the Constitution, claimed to have been adopted at the general election held in November, 1923, is null and void, because of non-compliance with the prescribed requirements of article 14 of the Constitution, as to the manner of proposing, submitting and adopting amendments.

IV. The establishment and operation of a municipal bus line for the transportation of passengers within the city for hire constitutes incurring indebtedness for other than a city purpose, and the giving of the city's money and the loaning of its credit in violation of the provisions of section 10 of article 8 of the State Constitution and is *ultra vires,* and the city possesses no franchise or power to furnish and operate a municipal bus line.

The complaint in the action brought by William Jay Schieffelin, plaintiff, appellant, and the motion for temporary injunction therein proceed upon the assumption that said constitutional amendment was duly adopted, and that said City Home Rule Law was duly enacted, and in that action the temporary injunction is sought solely upon the ground that neither the provisions of said constitutional amendment, nor of the said City Home Rule Law, authorize the establishment and operation of a municipal bus line by the defendants. The plaintiff Schieffelin contends that the power conferred by the amendment to the Constitution was

14

limited to the field of matters relating to the " property, affairs or government " of the city and that the matter of municipal operation or regulation of bus routes is not included within the scope of the powers thus granted.

On January 13, 1925, the mayor approved four local laws, which had been previously passed by the municipal assembly of the city of New York. This local legislation was enacted by the city authorities in pursuance of power said to be conferred by the Home Rule Amendment of the State Constitution and the City Home Rule Law which had been enacted by the State Legislature pursuant to the amendment. The Home Rule Amendment it is claimed was passed by the State Legislatures of 1922 and 1923 and was approved by the people at the general election of November 6, 1923. It replaced sections 2 and 3 of article 12 of the Constitution by new sections 2 to 7, inclusive, of that article. The City Home Rule Law is chapter 363 of the Laws of 1924.

The four local laws are as follows:

Local Law No. 3, amending section 242 of the Greater New York charter* by inserting a new subdivision 3 empowering the board of estimate and apportionment to establish routes for the municipal operation of buses, to prescribe the conditions of such operation and to approve of the rates of fare to be charged upon such routes and the character of service to be provided thereon.

Local Law No. 4, amending the Greater New York charter by inserting a new section 595-a conferring upon the commissioner of plant and structures jurisdiction over municipal bus operation upon routes established by the board of estimate and apportionment, subject to regulation of the same by the board of estimate and apportionment.

Local Law No. 5, amending the Greater New York charter, section 1458,† by excepting municipal bus routes from the requirement of a franchise from the board of estimate and apportionment as a prerequisite condition of bus operation on city streets.

Local Law No. 6, amending section 24 of the Transportation Corporations Law by excepting the city of New York or any department thereof operating a bus route from the provision that any operator of a bus route shall be deemed to be included within the meaning of the term " common carrier " as used in the Public Service Commissions [Commission] Law and subject to all the provisions of that law applicable to common carriers.

. The constitutional amendment, the City Home Rule Law and the

---

* See Laws of 1901, chap. 466, § 242, as amd. by Laws of 1905, chap. 629.— [Rep.

† Added by Laws of 1913, chap. 769.— [Rep.

four local laws specified constitute the foundation on which the city bases its right to own, use and operate a municipal bus line or system and to appropriate and expend therefor the necessary public moneys.

" These are the understructures of legislation," said the learned justice at Special Term in rendering his decision in favor of the defendants, " upon which defendants' proposed actions are claimed to be properly supported, and concededly unless the amendment of the Constitution and the City Home Rule Law empower the city itself to engage in this operation and were themselves constitutionally and validly enacted, the stream of local legislation with respect to means and procedure must fall, because impugned at its source." (*Browne* v. *City of New York*, 125 Misc. 1, 7.)

It is apparent, therefore, that the first and most important question to be determined is whether the constitutional amendment, the source of the city's alleged authority, is a valid amendment or is null and void, as asserted by the appellant Browne.

The Constitution is the supreme law of the State, embodying the principles upon which the government is founded, regulating the division of the sovereign powers, and directing to what persons each of these powers is to be confided and the manner in which it is to be exercised.

" In American Constitutional Law," says Cooley in his great work on Constitutional Limitations (7th ed. p. 5) " the word *Constitution* is used in a restricted sense, as implying the written instrument agreed upon by the people of the Union, or of any one of the States, as the absolute rule of action and decision for all departments and officers of the government, in respect to all the points covered by it, which must control until it shall be changed by the authority which established it, and in opposition to which any act or regulation of any such department or officer, or even of the people themselves, will be altogether void.  *  *  *  [p. 76]  The Constitution of the State is higher in authority than any law, direction, or order made by any body or any officer assuming to act under it, since such body or officer must exercise a delegated authority, and one that must necessarily be subservient to the instrument by which the delegation is made.

" In any case of conflict the fundamental law must govern, and the act in conflict with it must be treated as of no legal validity."

Lord Bryce, a profound student of our institutions, says in his " Modern Democracies " (Vol. II, pp. 10, 11) (1921): " The instruments which we call Constitutions are among the greatest contributions ever made to politics as a practical art; and they

are also the most complete and definite concrete expressions ever given to the fundamental principles of democracy."

After reference to the peculiar features of unwritten constitutions such as the British Constitution, he continues:

" But an American Written or Rigid Constitution is a single legal instrument prescribing the structure, scope, powers, and machinery of a government. It is, moreover, an instrument set in a category by itself, raised above ordinary laws by the fact that it has been enacted and is capable of being changed, not in the same way as statutes are changed by the ordinary modes of legislation, but in some specially prescribed way, so as to ensure for it a greater permanence and stability.

" This was virtually a new invention, a legitimate offspring of democracy, and an expedient of practical value, because it embodies both the principle of Liberty and the principle of Order. It issues from the doctrine that power comes only from the People, and from it not in respect of the physical force of the numerical majority but because the People is recognized as of right the supreme law giving authority. Along with the principle of Liberty, a Constitution embodies also the principle of self-restraint.

" The People have resolved to put certain rules out of the reach of temporary impulses springing from passion or caprice, and to make these rules the permanent expression of their calm thought and deliberate purpose. It is a recognition of the truth that majorities are not always right, and need to be protected against themselves by being obliged to recur, at moments of haste or excitement, to maxims they had adopted at times of cool reflection."

The first rule in interpreting and construing a Constitution is to give to it the effect and meaning contemplated by its framers and by the people who adopted it. What that intent and meaning is, is to be gathered, if possible, from the plain and ordinary meaning of the words used.

Lincoln in his Constitutional History of New York (Vol. 1, p. 750) says: " One of the subjects especially committed to this convention [of 1821] related to the method of amending the Constitution. The first Constitution was defective in not containing any provision for its amendment. Under that Constitution there could be no amendments, except by a convention, and probably this condition prevented many amendments, because of the unwillingness of the people to call conventions. The convention of 1821 adopted the plan, since continued, of permitting amendments to be recommended to the people by the Legislature; but, to prevent hasty action, required the proposed amendment to pass the scrutiny of two Legislatures."

The provision for amending the Constitution adopted by the Convention of 1821 has been in force ever since, having been readopted by the Constitutional Convention of 1894. It reads as follows: "Any amendment or amendments to this Constitution may be proposed in the Senate and Assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, and the yeas and nays taken thereon, and referred to the Legislature to be chosen at the next general election of Senators, and shall be published for three months previous to the time of making such choice; and if in the Legislature so next chosen, as aforesaid, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the Legislature to submit each proposed amendment or amendments to the people for approval in such manner and at such times as the Legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become a part of the Constitution from and after the first day of January next after such approval." (Const. 1821, art. 8, § 1; Const. 1846, art. 13, § 1; Const. 1894, art. 14, § 1. See, also, 1 R. S. 55; Session Laws of 1847, vol. 2, p. 409; 4 Lincoln's Const. Hist. N. Y. 794.) In 1821 the proposal was to be " referred to the Legislature then next to be chosen," and the vote therein was required to be two-thirds of all the members elected to each house. In 1846 the present phraseology was substantially adopted and has since remained unchanged.

This provision of the Constitution is undoubtedly one of the most important, if not the most important, of all of the provisions contained in the Constitution. It is intended to safeguard the organic law; to prevent it from being altered or diminished in its efficacy except by proceeding strictly in accordance with the method prescribed by it. It requires the utmost deliberation — action by two Legislatures, one of which is to be chosen after notice has been given to the people of the proposed amendment after the Senate and Assembly have acted thereon in the manner minutely described in the section quoted. It is only after two Legislatures have given their sanction and approval to the proposed amendment that the people can be called upon to vote as to its approval or rejection, and it is only after compliance with all of these requirements that a change can be wrought in the Constitution. However large a majority of the electorate may have voted upon the proposed amendment, even though the members of the Senate and Assembly may have been unanimous in their vote on a submission of the amend-

ment to the people, the Constitution nevertheless will remain unchanged if any of the requirements, express or implied, contained in article 14 are not strictly observed and complied with.

In construing the Constitution we must take the natural significance of the language employed.

In *Newell* v. *People* (7 N. Y. 9, 97) it was said: " Whether we are considering an agreement between parties, a statute or a Constitution, with a view to its interpretation, the thing we are to seek is, the thought which it expresses. To ascertain this, the first resort, in all cases, is, to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning, which involves no absurdity, and no contradiction between different parts of the same writing, then, that meaning, apparent upon the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed; in such a case, there is no room for construction. That which the words declare, is the meaning of the instrument; and neither courts nor Legislatures have the right to add or to take away from that meaning. This is true of every instrument, but when we are speaking of the most solemn and deliberate of all human writings, those which ordain the fundamental law of States, the rule rises to a very high degree of significance. It must be very plain, nay, absolutely certain, that the people did not intend, what the language they have employed, in its natural signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision."

In *People* v. *Rathbone* (145 N. Y. 434) the court said: " The latitude allowed in the construction of legislative acts is out of place, and would be unwise, when interpreting the fundamental law. Legislation aims at arranging the mechanism of the State for the benefit of its members and the question of intention, necessarily, is often of great importance and must be open to judicial inquiry; but the Constitution, which underlies and sustains the social structure of the State, must be beyond being shaken, or affected, by unnecessary construction, or by the refinements of legal reasoning."

Applying this rule of construction to the language of article 14, section 1, of the Constitution, it is obvious that except where it is to be amended by the action of a Constitutional Convention, two steps must be taken as conditions precedent to the adoption of a valid amendment: (1) An amendment to the Constitution must be proposed in the Senate and Assembly, and if agreed to by a majority of the members elected to each of the two houses, must be referred

to the Legislature to be chosen at the next general election of Senators, and must be published for three months previous to the time of making such choice; (2) if in the Legislature so next chosen such proposed amendment shall be agreed to by a majority of all the members elected to each house, it shall be the duty of the Legislature to submit such proposed amendment to the people for approval in such manner and at such time as the Legislature may prescribe.

It is just as essential that the proposed amendment shall be referred to the Legislature to be chosen at the general election of Senators next succeeding the proposal of the amendment and that it shall be published for three months previous to the time of the holding of such general election of Senators, as it is that the people shall vote upon such proposed amendment after the choice of Senators at the general election succeeding the publication of the proposed amendment. The theory of this provision clearly is, that the electorate who are to choose the Senators, and, necessarily, the Assemblymen, shall be informed of the exact nature of the amendment proposed, and shall, in the light of such information, cast their ballots for such members of the Senate and of the Assembly as shall reflect the views of a majority of the electorate as to the desirability of submitting such proposed amendment to a vote.

It is, therefore, manifest that if the people, at a general election at which Senators are to be chosen and prior to which a proposed amendment to one of the articles of the Constitution has been published, shall adopt an amendment to that very article, which not only changes its terms, but amounts to a redeclaration of the fundamental principle contained in the article as theretofore existing, and which becomes a part of the Constitution on the first of January following, such proposed amendment, as a result of the action of the electorate, no longer relates to the same article of the Constitution to which it referred at the time when it was agreed to be submitted to the Legislature to be chosen at the next general election of Senators. A new article has taken the place of and has superseded that to which the amendment was proposed. The notice embodied in the publication of the proposed amendment relates to a constitutional provision which had been changed prior to the time when the Legislature chosen at the election was organized. If, as in the present case, the proposed amendment referred to the Legislature in 1922 could be voted upon at the general election in 1923, it would, in 1922, have related to a provision of the Constitution different from that to which it would relate in 1923. The people who were informed in 1922 by the publication of the amendment as then proposed, would have in their minds a proposal

different from that upon which they would vote in 1923. That would nullify the manifest purpose of section 1 of article 14 of the Constitution.

The indisputable facts in the present case show that, in 1920, the Legislature passed a concurrent resolution for an amendment to *section 2 of article 12* as then existing, and, acting under the Constitution, referred this amendment to the Legislature to be chosen at the next general election of Senators in conformity with section 1 of article 14 of the Constitution, and publication was duly made as prescribed thereby and by section 295 of the Election Law of 1909 (as amd. by Laws of 1914, chap. 244; now Election Law of 1922, § 68). At the session of the Legislature held in 1922 a concurrent resolution of the Senate and Assembly proposing such amendment was passed, reading as follows:

" Concurrent Resolution of the Senate and Assembly proposing an amendment to section two of article twelve of the Constitution, in relation to city bills.

" Section 1. *Resolved* (if the Assembly concur), That section two of article twelve of the Constitution be amended to read as follows:

" § 2. All cities are classified according to the latest State enumeration, as from time to time made, as follows: The first class includes all cities having a population of one hundred and seventy-five thousand or more; the second class, all cities having a population of fifty-thousand and less than one hundred and seventy-five thousand; the third class, all other cities. Laws relating to the property, affairs or government of cities, and the several departments thereof, are divided into general and special city laws; general city laws are those which relate to all the cities of one or more classes; special city laws are those which relate to a single city, or to less than all the cities of a class. Special city laws shall not be passed except in conformity with the provisions of this section. After any bill for a special city law, relating to a city, has been passed by both branches of the Legislature, the house in which it originated shall immediately transmit a certified copy thereof to the mayor of such city, and within fifteen days thereafter the mayor shall return such bill to the clerk of the house from which it was sent, who if the session of the Legislature at which such bill was passed has terminated, shall immediately transmit the same to the Governor, with the mayor's certificate thereon, stating whether the city has or has not accepted the same. In every city of the first class, the mayor, and in every other city, the mayor and the legislative body thereof concurrently, shall act for such city as to such bill; but the Legislature may provide for the concurrence of the legislative body in cities of the first class.

The Legislature shall provide for a public notice and opportunity for a public hearing concerning any such bill in every city to which it relates, before action thereon. Such a bill, if it relates to more than one city, shall be transmitted to the mayor of each city to which it relates, and shall not be deemed accepted unless accepted as herein provided, by every such city. Whenever any such bill is accepted as herein provided, it shall be subject as are other bills, to the action of the Governor. Whenever, during the session at which it was passed, any such bill is returned without the acceptance of the city or cities to which it relates, or within such fifteen days is not returned, it may nevertheless again be passed by both branches of the Legislature, and it shall then be subject as are other bills, to the action of the Governor. In every special city law which has been accepted by the city or cities to which it relates, the title shall be followed by the words ' accepted by the city,' or ' cities,' as the case may be; in every such law which is passed without such acceptance, by the words ' passed without the acceptance of the city,' or ' cities,' as the case may be.

" § 2. *Resolved* (if the Assembly concur), That the foregoing amendment be submitted to the people at the general election in the year nineteen hundred and twenty-two in accordance with the provisions of the Election Law."

In conformity with the terms of such concurrent resolution and of the Election Law the proposed amendment to section 2 of article 12 was submitted to the people at the general election held in 1922, and was duly adopted and became a part of the Constitution on January 1, 1923. (See, also, Election Law of 1922, §§ 70, 77, 80, 173, revising Election Law of 1909, § 294, as amd. by Laws of 1910, chap. 446.)

At the session of 1922, and after the adoption by the Legislature of the concurrent resolution above set forth, the Legislature also adopted a concurrent resolution to *amend article 12*, reading as follows:

" Concurrent Resolution of the Senate and Assembly proposing amendments to article twelve of the Constitution, relating to cities and villages, so as to regulate legislation concerning them and guarantee to them the right of municipal self-government.

" Section 1. *Resolved* (if the Assembly concur), That article twelve of the Constitution be hereby amended to read as follows:

"ARTICLE XII.

" § 1. It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrict

their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and in contracting debt by such municipal corporations; and the Legislature may regulate and fix the wages or salaries, the hours of work or labor, and make provision for the protection, welfare and safety of persons employed by the State or by any county, city, town, village or other civil division of the State, or by any contractor or subcontractor performing work, labor or services for the State, or for any county, city, town, village or other civil division thereof.

" § 2. The Legislature shall not pass any law relating to the property, affairs or government of cities, which shall be special or local either in its terms or in its effect, but shall act in relation to the property, affairs or government of any city only by general laws which shall in terms and in effect apply alike to all cities except on message from the Governor declaring that an emergency exists and the concurrent action of two-thirds of the members of each house of the Legislature.

" § 3. Every city shall have power to adopt and amend local laws not inconsistent with the Constitution and laws of the State, relating to the powers, duties, qualifications, number, mode of selection and removal, terms of office and compensation of all officers and employees of the city, the transaction of its business, the incurring of its obligations, the presentation, ascertainment and discharge of claims against it, the acquisition, care, management and use of its streets and property, the wages or salaries, the hours of work or labor, and the protection, welfare and safety of persons employed by any contractor or subcontractor performing work, labor or services for it, and the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health. The Legislature shall, at its next session after this section shall become part of the Constitution, provide by general law for carrying into effect the provisions of this section.

" § 4. The provisions of this article shall not be deemed to restrict the power of the Legislature to enact laws relating to matters other than the property, affairs or government of cities.

" § 5. The Legislature may by general laws confer on cities such further powers of local legislation and administration as it may, from time to time, deem expedient.

" § 6. All elections of city officers, including supervisors and judicial officers of inferior local courts, elected in any city or part of a city, and of county officers elected in the counties of New York and Kings, and in all counties whose boundaries are the same as those of a city, except to fill vacancies, shall be held on the

Tuesday succeeding the first Monday in November in an odd-numbered year, and the term of every such officer shall expire at the end of an odd-numbered year. The terms of office of all such officers elected before the first day of January, one thousand eight hundred and ninety-five, whose successors have not then been elected, which under existing laws would expire with an even-numbered year, or in an odd-numbered year and before the end thereof, are extended to and including the last day of December next following the time when such terms would otherwise expire; the terms of office of all such officers, which under existing laws would expire in an even-numbered year, and before the end thereof, are abridged so as to expire at the end of the preceding year. This section shall not apply to elections of any judicial officer, except judges and justices of inferior local courts.

" § 7. The provisions of this article shall not affect any existing provision of law; but all existing charters and other laws shall continue in force until repealed, amended, modified or superseded in accordance with the provisions of this article. Nothing in this article contained shall apply to or affect the maintenance, support, or administration of the public school systems in the several cities of the State, as required or provided by article nine of the Constitution.

" § 2. *Resolved* (if the Assembly concur), That the foregoing amendment be referred to the Legislature to be chosen at the next general election of Senators, and in conformity with section one of article fourteen of the Constitution, be published for three months previous to the time of such election."

This latter resolution, it will be noted, was entitled: " Concurrent Resolution of the Senate and Assembly proposing amendments to *article twelve* of the Constitution, relating to cities and villages, so as to regulate legislation concerning them and guarantee to them the right of municipal self-government." It began with the words: " Resolved   *   *   * That article twelve of the Constitution be hereby amended to read as follows: " and, pursuant to said concurrent resolution, section 1 of article 14 of the Constitution, and section 68 of the Election Law of 1922, it was presumably published for three months prior to the election held in November, 1922, as was published for the period of four weeks, as prescribed by section 80 of the Election Law of 1922, the concurrent resolution entitled " Concurrent Resolution of the Senate and Assembly proposing an amendment to section two of article twelve of the Constitution, in relation to city bills," which resolution began with the words: " Resolved   *   *   * That section two of article twelve of the Constitution be amended to read as follows: " Presumably the additional requirements of the Election Law, regulating the sub-

mission of said proposed amendment of section 2 of article 12 of the Constitution, were followed. (See Election Law of 1922, §§ 70, 77, 173.)

Consequently both of these resolutions were before the electorate at the general election held in November, 1922. The first proposed amendment — the amendment to section 2 of article 12 — was to be voted upon by the people at that election. The other proposed amendment to article 12 was not to be voted upon — the people were merely informed of the terms of the amendment thereby proposed. No action was to be taken by the electorate with regard to it, except in so far as their votes for members of the Legislature might be affected by the information conveyed. When the electorate acted it adopted the proposed amendment, amending section 2 of article 12, and re-enacted or with additions readopted that section, which constituted the most important feature of article 12 of the Constitution, as it then stood and as it had been adopted in 1894. By that action of the electorate, article 12, as so amended, superseded article 12 as it existed at the time when these concurrent resolutions were acted upon by the Legislature, and on January 1, 1923, section 2 of article 12 as theretofore existing ceased to exist and the amended article took its place.

Although the amendment to section 2 of article 12 adopted at the November, 1922, election did not make an extensive change in the Constitution, the change made was material. It was regarded as of sufficient importance to submit it to the people for their approval. Nothing contained in the Constitution can be regarded as unimportant or unessential. In this case it was an extremely desirable improvement in the system of legislation with regard to cities, which was found as a result of experience to conduce to the public welfare. In spite of the fact that the people had notice of the proposed amendment to the whole of article 12, they nevertheless adopted the proposed amendment relating to section 2 and re-enacted section 2 of article 12 with the amendment.

From a constitutional standpoint the situation is no different from what it would have been if section 2 of article 12 had been changed in its entirety.

The result was that whatever changes the Legislature of 1923 had undertaken to initiate by the adoption of the concurrent resolution to amend article 12 became ineffective when article 12 was amended and its essential provision was reapproved and re-enacted by the People in 1922. What the Senate and Assembly had done respecting the concurrent resolution proposing to amend article 12 was merely tentative, and when the subject-matter to which that concurrent resolution was directed had been changed, that concur-

rent resolution abated and was deprived of all vitality. When, therefore, the Legislature of 1923 sought to adopt the concurrent resolution amending article 12 and to submit to the people for approval at the general election to be held in November, 1923, the proposed constitutional amendment therein set forth, that concurrent resolution so far as article 12 is concerned related to an entirely different Constitution from that which existed when the concurrent resolution proposing the same amendment was passed by the Legislature the year before.

What the Legislature of 1923 undertook to do by adopting the concurrent resolution to amend article 12 was to attempt an amendment of the Constitution, as it stood on January 1, 1923, at the election to be held in November, 1923, without taking the preliminary step required by the Constitution, of first referring that concurrent resolution " to the Legislature to be chosen at the next general election of Senators," and publishing the same for three months previous to the time of making such choice.

The introductory words of section 1 of article 14 of the Constitution are: "Any amendment or amendments to this Constitution may be proposed in the Senate and Assembly; and if," etc. The words " this Constitution " necessarily refer to that part of the Constitution which is sought to be amended as it exists at the time when a change is proposed to be acted upon by the people.

During the legislative session of 1922 the words " this Constitution," as applied to article 12, meant something entirely different from those words when employed during the session of 1923. In 1922 they referred to the Constitution as it existed prior to November 7, 1922. In 1923 they referred to article 12 as amended by the concurrent resolution adopted at the election in 1922, which article as amended went into effect January 1, 1923.

The plain meaning of article 14 of the Constitution precludes and renders nugatory the submission to the people for their approval at a general election of a proposed amendment of any part of the Constitution, where the same portion of that instrument, as it existed at the time such proposed amendment was acted upon by the Senate and Assembly, has already undergone a change by the action of the Legislature and vote of the people. Any other interpretation of the language of article 14 would tend to nullify the safeguards deliberately created by the organic law for the purpose of preventing hasty or ill-considered amendments, and of affording to the people two opportunities to determine upon the course to be pursued with respect to the adoption or rejection of a proposed amendment.

The action of the Legislature of 1923 in adopting the said con-

current resolution to amend article 12 and in submitting the said proposed amendment to the people to be voted upon at the general election of that year, was, therefore, null and void.

It has been decided many times that the provisions of a Constitution which regulate its amendment are not directory, but mandatory, and that a strict observance of every substantial requirement is essential to the validity of the proposed amendment. The courts have repeatedly declared that these provisions are as binding on the people as on the Legislature, and that even the electorate is powerless by its vote of approval to give legal sanction to an amendment the submission of which was brought about in disregard of the limitations contained in the Constitution.

In *Collier* v. *Frierson* (24 Ala. 100) the court said (p. 109): " We entertain no doubt, that, to change the Constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself, must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The Constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said, that certain acts are to be done — certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the Legislature or any other department of the government, can dispense with them. To do so, would be to violate the instrument which they are sworn to support; and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment, which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

In *Oakland Paving Co.* v. *Hilton* (69 Cal. 479; 11 Pac. 3) Mr. Justice THORNTON said: " The Constitution provides for its amendment, and points out the mode specifically by which it shall be done. Inasmuch as the mode of amendment is so established by the paramount law, it is unnecessary to consider the question whether the people of the State may not amend its Constitution where no mode is fixed for that purpose in the organic law. When a mode is thus established and ordained, it must be followed. The people of a State may impose a limit upon their own power, and when this is done by the Constitution, it must be regarded as much a portion of the paramount law, and as obligatory on the whole people, as any other portion of the Constitution. If we do not so hold, we would sanction revolution and violence, and place lawlessness on a level with law. The majority of the people, according to law, having adopted the Constitution with a mode of amendment

in it, we must regard it as a solemn declaration to the minority in the State, as binding as a compact with such minority, that the majority, however large or overwhelming, will never exercise its irresistible power, its *vis major*, to change the law of its organization as a government in any other way. We hold it to be sound law that a Constitution, adopted as was the present Constitution of the State of California, is not lawfully changed by the votes of every elector in the State, unless in the mode provided in it. ( *Koehler* v. *Hill*, 60 Iowa, 547.) The majority in favor of the change may be so irresistible in its physical power as to command the forced acquiescence or unwilling consent of an inconsiderable minority, but nevertheless a change of the Constitution so brought about contrary to its provisions would be lawless, revolutionary, and unconstitutional, and it would be the duty of this court, in obedience to the oath which its members have taken, so to declare it, in favor of any litigant who should invoke its judgment in the course of regular procedure, though the sole litigant invoking its aid and power should constitute the nonconsenting minority. If they did not so declare, the organic law would not afford that protection and refuge which it was intended to afford."

In *Livermore* v. *Waite* (102 Cal. 113) the court said: " The power of the Legislature to initiate any change in the existing organic law is, however, of greatly less extent [than by Constitutional Convention], and, being a delegated power, is to be strictly construed under the limitations by which it has been conferred. In submitting propositions for the amendment of the Constitution, the Legislature is not in the exercise of its legislative power, or of any sovereignty of the people that has been intrusted to it, but is merely acting under a limited power conferred upon it by the people, and which might with equal propriety have been conferred upon either house, or upon the Governor, or upon a special commission, or any other body or tribunal. The extent of this power is limited to the object for which it is given, and is measured by the terms in which it has been conferred, and cannot be extended by the Legislature to any other object, or enlarged beyond these terms. The Legislature is not authorized to assume the functions of a constitutional convention, and propose for adoption by the people a revision of the entire Constitution under the form of an amendment, nor can it submit to their votes a proposition which, if adopted, would by the very terms in which it is framed be inoperative."

In *Opinion of Justices* (6 Cush. 573), under the procedure prevailing in Massachusetts, the Legislature of that State submitted to the Supreme Court for its opinion the following question: " Can any specific and particular amendment or amendments to the

Constitution be made in any other manner, than that prescribed in the ninth article of the amendments adopted in 1820? " The question was answered in the negative, the court saying: " We presume, therefore, that the opinion requested applies to the existing Constitution and laws of the Commonwealth, and the rights and powers derived from and under them. Considering the questions in this light, we are of opinion * * * that, under and pursuant to the existing Constitution, there is no authority given by any reasonable construction or necessary implication, by which any specific and particular amendment or amendments of the Constitution can be made, in any other manner than that prescribed in the ninth article of the amendments adopted in 1820. Considering that previous to 1820, no mode was provided by the Constitution for its own amendment, that no other power for that purpose, than in the mode alluded to, is anywhere given in the Constitution, by implication or otherwise, and that the mode thereby provided appears manifestly to have been carefully considered, and the power of altering the Constitution thereby conferred to have been cautiously restrained and guarded, we think a strong implication arises against the existence of any other power, under the Constitution, for the same purposes."

In *State ex rel. Woods* v. *Tooker* (15 Mont. 8; 25 L. R. A. 560; 37 Pac. 840) it was held that compliance with the Constitution of Montana, requiring the Secretary of State to publish proposed amendments in full for three months before the election to be held for their ratification, was essential to the validity of any amendment. Mr. Justice DEWITT, in the course of his opinion, said: " We cannot better introduce this consideration than by quoting from Judge Cooley, whose language we find cited, and his doctrine largely followed, by the courts which have treated the subject of the construction of constitutional provisions. Judge Cooley says [Cooley's Const. Lim. (4th ed.), pp. 94, 95]: ' But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a Constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and, if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper

province of ordinary legislation. We are not, therefore, to expect to find in a Constitution provisions which the people, in adopting it, have not regarded as of high importance and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised, as well by the delegate, as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument when we infer that such directions are given to any other end. Especially when, as has been already said, it is but fair to presume that the people in their Constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication.' "

In *Durfee* v. *Harper* (22 Mont. 354; 56 Pac. 582) Mr. Justice HUNT said: " Thus the proposition comes back to the statement that from the people, as a source, alone flows the delegated power of the Legislature to even propose amendments to those ' unvarying rules ' by which ' alike the government and the governed ' are controlled, and where those rules adopted by the people are part of their Constitution, and lay down how this power may be exercised by the Legislature, there is no discretion in that body to ignore the commands of the fundamental authority, or override its limitations in great or small matters; and this principle holds good, not only for the legislative, but, so far as applicable, for the judicial and executive departments of the government as well."

In *Crawford* v. *Gilchrist* (64 Fla. 41; 59 So. 963) Chief Justice WHITFIELD, dealing with a similar situation, said: " Under our system of constitutional government regulated by law, a determination of whether an amendment to the Constitution has been validly proposed and agreed to by the Legislature, depends upon the fact of substantial compliance or non-compliance with the mandatory provisions of the existing Constitution as to how such amendments shall be proposed and agreed to, and such determination is necessarily required to be in a judicial forum where the Constitution provides no other means of authoritatively determining such questions.   *   *   *

" The people of the State have a right to amend their Constitution, and they also have a right to require proposed amendments to

15

be agreed to and submitted for adoption in the manner prescribed by the existing Constitution, which is the fundamental law. If essential mandatory provisions of the organic law are ignored in amending the Constitution of the State and vital elements of a valid amendment are omitted, it violates the right of all the people of the State to government regulated by law. It is the duty of the courts in authorized proceedings to give effect to the existing Constitution. The proposal of amendments to the Constitution is a highly important function of government, that should be performed with the greatest certainty, efficiency, care and deliberation. With this in view, the organic law confers this prerogative exclusively upon the Legislature, a sovereign deliberative body, and a co-ordinate department of the State Government, whose acts are independent of the other departments and subject only to the limitations contained in the fundamental organic law of the land. The provisions of the Constitution mandatorily require amend-ments of the Constitution to be proposed by either house of the Legislature in regular session and to be ' agreed to by three-fifths of all the members elected to each house ' of the Legislature. These requirements clearly contemplate that such amendments shall be agreed to by the deliberate, final, affirmative vote of the requisite number of the members of each house of the Legislature duly taken at a regular session. Every word of a State Constitution should be given its intended meaning and effect, and essential provisions of a Constitution are to be regarded as mandatory."

In *Koehler* v. *Hill* (60 Iowa, 543; 14 N. W. 738; 15 id. 609) this subject was exhaustively treated in a most important case, where an amendment to the Constitution prohibiting the manufacture or sale as a beverage of any intoxicating liquor was involved. It was held that the amendment was unconstitutional because one of the requirements, claimed by the promoters of the amendment to be immaterial, had not been observed.

In *McConaughy* v. *Secretary of State* (106 Minn. 392; 119 N. W. 408) Mr. Justice ELLIOTT, collating the decisions, said: "An exam-ination of the decisions shows that the courts have almost uniformly exercised the authority to determine the validity of the proposal, submission, or ratification of constitutional amendments."

After discussing the authorities exhaustively, the opinion con-tinues; " The people of most of the States inserted in their Con-stitutions provisions for their own amendments, thus deliberately placing restrictions upon their own freedom of political action. * * * The principle was thus established that the people in the mass can no more legally act contrary to the Constitution than can one individual or a number of individuals. * * * Having

by their voluntary political action founded the government and provided a method for the amendment of the instrument which expresses their will, they must, if they would act lawfully, respect their own mandate. If a change is desired, it must be effected by amendment by means of the constitutional procedure * * *.

" Of course, no amendment of a Constitution can be adopted unless it has received the requisite vote. This is vital; but an amendment which is submitted to the people in disregard of the constitutional mandate is ineffective, although the vote may be in its favor."

In *Kadderly* v. *Portland* (44 Ore. 118; 74 Pac. 710; 75 id. 222) the court was confronted with a question as to non-compliance with a requirement with regard to the method of amending the Constitution. It was held that an amendment, though not on the same subject or article, is an " additional " one within the provisions of the Oregon Constitution which prohibit the proposal of any additional amendment or amendments to the Constitution while one is waiting action of a second Legislature or of the electors. And it was further held that whether an amendment to the Constitution has been regularly proposed, adopted and ratified is a question for the courts, and not for the political department of the government.

The decision followed *Collier* v. *Frierson* (*supra*); *Koehler* v. *Hill* (*supra*); *State ex rel. McClurg* v. *Powell* (77 Miss. 543; 27 So. 927); *Bott* v. *Secretary of State* (63 N. J. Law, 289; 43 Atl. 744; 45 L. R. A. 251) and *Livermore* v. *Waite* (*supra*). Quoting from the opinion in *State ex rel. McClurg* v. *Powell*, the court said: " The true view is that the Constitution, the organic law of the land, is paramount and supreme over Governor, Legislature, and courts. When it prescribes the exact method in which an amendment shall be submitted, and defines positively the majority necessary to its adoption, these are constitutional directions, mandatory upon all departments of the government, and without strict compliance with which no amendment can be validly adopted. Whether an amendment has been validly submitted or validly adopted depends upon the fact of compliance or non-compliance with the constitutional directions as to how such amendments shall be submitted and adopted; and whether such compliance has in fact been had must, in the nature of the case, be a judicial question."

Further on in the opinion Mr. Justice BEAN says: "A Legislature, in proposing and agreeing to amendments and submitting them to the people, is acting under a limited authority, and its powers must be strictly construed. It may propose and submit amendments

in the manner provided by the Constitution, and in no other way. In doing so, it does not exercise ordinary legislative powers, but rather acts as the agent of the people in the discharge of a ministerial duty, deriving its authority alone from the provisions of the Constitution regulating its own amendment. It must comply strictly with all the requirements thereof, and, when the Constitution provides that an amendment, after being adopted by the second legislative assembly, shall then be submitted to the electors and published without delay, it seems to us to mean that it must be done by the legislative assembly last adopting it. The Legislature may, and does in some instances, while acting in its ordinary capacity, possess large discretionary powers, and the failure or neglect of one session to perform a duty imposed upon it would not prevent another session from discharging it. When, however, the Legislature is acting as the mere agent of the people, in the performance of certain defined and prescribed duties enumerated in the Constitution, it cannot exercise its powers beyond the letter of its authority, and must act within the limits of that which is delegated."

Of like import are *Ellingham* v. *Dye* (178 Ind. 336; 99 N. E. 1; appeal dismissed in *Marshall* v. *Dye*, 231 U. S. 250); *State ex rel. Owen* v. *Donald* (160 Wis. 21; 151 N. W. 331); *State ex rel. Postel* v. *Marcus* (160 Wis. 354; 152 N. W. 419); *State ex rel. Greenlund* v. *Fulton* (99 Ohio St. 168; 124 N. E. 172); *State ex rel. Bentley* v. *Hall* (178 Wis. 109; 189 N. W. 265); *Hamilton* v. *Secretary of State* (221 Mich. 541; 191 N. W. 829); *Hooper* v. *State* (206 Ala. 371; 89 So. 593); *Boyd* v. *Olcott* (102 Ore. 327; 202 Pac. 431); *McBee* v. *Brady* (15 Ida. 761; 100 Pac. 97).

The cases referred to above indicate the uniformity with which courts throughout the country have regarded as mandatory the provisions of a Constitution relating to the method of its amendment. In many of these cases cited the action of the people was declared to be nugatory although the constitutional provision which was disregarded might have been described as apparently technical or unimportant. In all of these cases, however, the action of the court was based upon a great principle, namely, that the fundamental law of the State can only be changed after there has been a strict observance of the limitations which the people have imposed upon themselves with respect to the steps to be pursued in order to make an effective amendment of the organic law.

The contention made to the effect that because the procedure adopted by the Legislature in the instant case, or a procedure akin thereto, was resorted to heretofore by the Legislature in submitting certain constitutional amendments for adoption, a practical inter-

pretation of the Constitution in that regard was thereby established which may not now be questioned is without merit. The Legislature is chosen for the purpose of making laws and the power to propose constitutional amendments is only incidental. If the Legislature has on occasion violated the organic law its action in that respect cannot be regarded as a practical construction of the Constitution binding on the court.

In *Rathbone* v. *Wirth* (150 N. Y. 459) Judge GRAY, speaking for the Court of Appeals (p. 476), said: " I perceive no force in the argument that there has been a practical construction of the Constitution, given by the Legislature and acquiesced in and acted upon by the executive and administrative departments of the government. The question here is purely one of law: Is the constitutional provision referred to violated by this statute? Is the passage of such a law authorized by the Constitution? Practical constrution of a law is usually accorded force, when it relates to the business conducted by the departments of the State government and when the legislation, depended upon to establish it, has been clear and uniform in character, for a long period of years. But, to use Judge Cooley's language, ' acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the Constitution and appointed judicial tribunals to enforce it.' The question before us is not one of legislative policy in relation to the business of State government. It is whether the Legislature has the power to interfere with the local concerns of a municipality and by arbitrary methods to prevent majority rule in the selection of local officers. In the presence of the constitutional provision, is it not an assumption of a power, neither expressly granted, nor to be implied? The question is no less than this: Having a written Constitution, shall we, and may we, disregard one of its commands and, though the court is set as the people's bulwark against legislation which contravenes constitutional provisions, shall it aid the Legislature when overstepping the limits assigned to its action? We cannot dispose of the question as one of legislative discretion; for, if we construe away such an express provision, upon however so plausible a theory, we open the door to future attacks upon the fundamental law, which underlies the structure of the State."

In *Matter of Manhattan Savings Instn.* (82 N. Y. 142) it was held that the practical construction put upon a statute by public officers whose duty it is to obey it is not controlling upon the court.

In *People ex rel. West Side Electric Co.* v. *Consolidated Telegraph & E. S. Co.* (187 N. Y. 58) Judge WILLARD BARTLETT said: " There is no room for the application of the doctrine of practical construction

in the case of a statute free from ambiguity or not subject to any reasonable doubt as to the meaning of its provisions, particularly when these are considered in the light of contemporaneous legislative enactments *in pari materia.* ' Where no ambiguity or doubt appears in the law we think the same rule obtains here as in other cases, that the court should confine its attention to the law and not allow extrinsic circumstances to introduce a difficulty where the language is plain.' (Cooley's Const. Limitations [6th ed.], p. 84.) ''

In *Louisville & Nashville R. R.* v. *Kentucky* (161 U. S. 677, 690) the court said: '' While the doctrine of contemporaneous construction is doubtless of great value in determining the intentions of parties to an instrument ambiguous upon its face, yet to justify its application to a particular case, such contemporaneous construction must be shown to have been as broad as the exigencies of the case require. * * * As is said by Mr. Justice Cooley, in his Constitutional Limitations (6th ed.) page 85: 'A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period in violation of the constitutional prohibition, without the mischief which the Constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the Constitution.' ''

In *Houghton* v. *Payne* (194 U. S. 88) Mr. Justice BROWN said: '' Contemporaneous construction is a rule of interpretation, but it is not an absolute one. It does not preclude an inquiry by the courts as to the original correctness of such construction. A custom of the department, however long continued by successive officers, must yield to the positive language of the statute.''

In 2 Sutherland on Statutes and Statutory Construction (2d ed. § 477) the author shows that it is only a practical construction of long duration that can be considered, and that it is only applicable to cases where the law to be interpreted is obscure in its terms, and even then the interpretation invoked must have been uniform, continuous and notorious.

None of these elements is found here. The only instance adverted to by respondents is one which occurred in 1920, and against this alleged precedent stands the uniform contrary procedure of obeying the existent constitutional requirement through its varying details in the case of every amendment to the Constitution that has been proposed since 1821, when what is present article 14, relating to amendments, was made a part of our fundamental law, or at least since 1846, when the present phraseology was adopted.

The circumstances under which section 3 of article 14 of the

Constitution was adopted are adverted to in Lincoln's Constitutional History of New York (Vol. 2, p. 576; vol. 3, p. 671).

When the Constitutional Convention of 1894 was in session it became known that a proposed amendment to the Judiciary Article had been twice considered by the Legislature and was to be voted upon at the general election to be held in the year 1894, at which time the new Constitution was likewise to be submitted to a vote. This proposed amendment provided for an increase in the number of county judges of Kings county. The Judiciary Article which was to be submitted at the general election of 1894 likewise provided for additional county judges in Kings county.

It was accordingly deemed desirable to insert in article 14 a new section, which is section 3 and reads: "Any amendment proposed by a Constitutional Convention relating to the same subject as an amendment proposed by the Legislature, coincidently submitted to the people for approval at the general election held in the year one thousand eight hundred and ninety-four, or at any subsequent election, shall, if approved, be deemed to supersede the amendment so proposed by the Legislature."

That provision laid down a rule of interpretation whereby an amendment initiated by a Constitutional Convention was given preference over one initiated by the Legislature in case both resulted in a favorable vote.

The question which arises in the present case is of an entirely different character and is to be determined by the fair intendment, purpose and meaning of the language contained in section 1 of article 14 of the Constitution.

The failure of the Senate and Assembly, at the time they undertook to pass the concurrent resolution to amend article 12 of the Constitution by adding new sections 2 to 7, inclusive, to enter the proposed amendment in their journals with the yeas and nays is an additional reason which renders such amendment null and void. That was made an essential prerequisite to a valid amendment by the express terms of section 1 of article 14 of the Constitution, which declared " and if the same [an amendment proposed in the Senate and Assembly] shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments *shall be entered on their journals,* and the yeas and nays taken thereon, and referred to the Legislature to be chosen at the next general election of Senators." This requirement was not complied with by either house.

The decisions on this subject are numerous and explicit. It was carefully considered in *Oakland Paving Co.* v. *Hilton* (69 Cal. 479; 11 Pac. 3) where the Constitution of California was identical in

its requirements in this regard with the Constitution of this State. It was held that the requirement that the proposed amendment shall be entered in the journals of the two houses required the amendment to be copied or enrolled on the journal in full; in other words, that the identical amendment must appear on the journal, and that no identifying or other reference to it in any way would satisfy the requirement. In the course of his opinion Mr. Justice THORNTON said: "As the journals of the Senate and Assembly are records, and intended to be such, the obvious meaning of entering a proposed amendment in the journals is to make such amendment a matter of record. Entering in the journals is the same as entering in or on the record. Why should it be entered for any other purpose? And when entered as a record, it has all the effect and subserves all the purposes of a record. *The great purpose is to preserve in permanent and enduring form authentic and reliable evidence of the contents of the amendment proposed, that in the form in which it appears on such record, it may be submitted to the electors for ratification by their suffrages, and when ratified, the evidence of what has been ratified may be preserved in an unmistakable, permanent, and enduring form. To furnish and preserve this evidence in a certain and more unmistakable form and manner, the entry must be made in the journal of each house.* The journals should be regarded as matter of record, and when questions arise as to what is contained therein, they must be tried and determined by inspection of the record only. The record in the journals is like other records, and, as Lord Coke declares, 'is a monument of so high a nature and importeth in itself of such verity, that if it be pleaded that there is no such record, it shall not receive any trial by witnesses, jury, or otherwise, but only by itself.' (3 Bla. Com. 331.)"

This decision follows *Koehler* v. *Hill* (60 Iowa, 543; 14 N. W. 738; 15 id. 609), which, as previously stated, involved the validity of a constitutional amendment prohibiting the manufacture or sale as a beverage of intoxicating liquor, and in which it was held that the amendment was void solely because the joint resolution proposing it was not entered on the journals of the two houses, as required by the Constitution. The language of the Constitution of Iowa was identical with the language of section 1 of article 14 of our Constitution, in so far as it related to amendments. It provided that an amendment might be proposed in either house of the General Assembly, and if the same should be agreed to by a majority of the members elected to each of the two houses, the proposed amendment should be entered on the journals with the yeas and nays taken thereon. The court said: "We deem it sufficient to say that, if there is any provision of the Constitution

which should be regarded as mandatory, it is where the Constitution provides for its own amendment otherwise than by means of a convention called for that purpose. The powers of a convention are, of course, unlimited. The members thereof are the representatives of the people, called together for that purpose. The object of the provision cannot be doubted or misunderstood. It is to preserve in the manner indicated the identical amendment proposed, and in an authentic form, which, under the Constitution, is to come before the succeeding General Assembly. No better mode could have been adopted, when it is considered that, to be effective, the proposed amendment must be agreed to by the succeeding General Assembly."

In *McBee* v. *Brady* (*supra*) the provision with regard to amendments of the Constitution prescribed by the organic law of Idaho was likewise identical with section 1 of article 14 of the New York Constitution. It was held that the requirement as to entering a proposed amendment, together with the yea and nay vote thereon, on the journals of the two houses, was mandatory, and that a failure to comply with this requirement was fatal.

To the same effect are *State* v. *Brookhart* (113 Iowa, 250; 84 N. W. 1064); *People* v. *Loomis* (135 Mich. 556; 98 N. W. 262); *State* v. *Marcus* (160 Wis. 354; 152 N. W. 419).

The journals of the Assembly and Senate for 1922 are public records of which the court will take judicial notice. The affidavit contained in the record on the appeal from the order fully states the contents of the journals relating to the subject now under consideration. This affidavit, together with the affidavit filed by respondents, supplies the proof on this subject. From these affidavits it appears the " Concurrent Resolutions " were not entered at length but by title and numbers only, followed by the vote thereon by ayes and noes.

The action by Stewart Browne is brought by him as a taxpayer against the municipal authorities, pursuant to the express authority conferred by section 51 of the General Municipal Law, to enjoin an illegal act which affects the property of the municipality and would result in the waste of its funds. The board of estimate and apportionment has appropriated $135,000 of the city's money for the establishment of municipal buses, their equipment and operation. Recognizing the effect of the decision in *Schafer* v. *City of New York*, in which, at the instance of a taxpayer, similar acts were enjoined because of lack of power on the part of the municipality, the defendants are now proceeding under four local laws claimed to have been adopted by the municipal assembly pursuant to the City Home Rule Law of 1924, which, in turn, is based upon the

alleged Home Rule Article in the Constitution claimed to have been adopted in 1923. .

It necessarily follows that, if the alleged amendment of 1923 was not adopted in conformity with the Constitution, the City Home Rule Law and the local laws on which the defendants' action is sought to be predicated, would be unconstitutional and void.

The action by Stewart. Browne is, therefore, properly brought by a taxpayer pursuant to statutory authority, in order to determine the legality of action taken by the municipal authorities, and the legality of their action depends upon the validity of the constitutional amendment upon which their acts are sought to be predicated.

In any case of conflict the fundamental law must govern, and the act in conflict with it must be treated as of no validity. But no mode has yet been devised by which these questions of conflict are to be discussed and settled as abstract questions and their determination is necessary or practicable only when public or private rights would be affected thereby. They then become the subject of legal controversy; and legal controversies must be decided by the courts.

" What a Court is to do, therefore," says Cooley on Constitutional Limitations (7th ed. p. 89) " is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a Court has occasion to pass upon it."

We believe the plain meaning, purpose and intent of the language used in the constitutional provision with regard to amendments at the time of its first adoption in 1821, to be that after the adoption of that Constitution two years or more must elapse before it could be altered or amended, that any provision of the Constitution having been once altered or amended, could not again be altered or amended until two years or more thereafter; and that any concurrent resolution proposing a constitutional amendment should be entered in full upon the journals of both houses of the Legislature. We believe that to be the plain meaning, purpose and intent of the language used in article 14 of the Constitution adopted and approved by the Constitutional Convention of 1894, and later ratified by the people of the State, and we believe that such is the plain meaning, purpose and intent of the language of article 14 of the Constitution as it exists to-day. ` `

It might well be said of this provision in our State Constitution what Madison wrote of the amendment provision in the Constitution of the United States (Art. 5): " It guards equally against that extreme facility which would render the Constitution too mutable;

and that extreme difficulty which might perpetuate its discovered faults." (The Federalist, No. XLIII. See Vol. 1 [Bourne ed. 1914], p. 302; Ford ed. 1898, p. 291.)

The purpose of the provision was to prevent hasty action on the part of the people in changing the organic law. Along with the principle of liberty a Constitution embodies also the principle of self-restraint. That was the self-restraint the people imposed upon themselves and only the people themselves can remove it. Mindful of the purpose which underlies this self-imposed restraint placed by the people themselves upon their own freedom of political action we believe it is clearly to the advantage of the people that the constitutional provisions regarding amendments to the Constitution should be strictly construed and strictly enforced.

The loose construction of article 14 and the lax method in carrying out its provisions contended for by respondents, if judicially approved, would bring every provision of the fundamental law to the level of a local statute which being enacted one year may be repealed or amended the next.

In construing Constitutions, courts have nothing to do with the argument *ab inconvenienti* and should not "bend the Constitution to suit the law of the hour." (*Greencastle Township* v. *Black*, 5 Ind. 557, 565.)

If the law does not work well the people can amend it; and inconvenience can be borne long enough to await that process.

The great importance of the decision to be rendered in this litigation, involving as it does, the organic law of the State, and affecting as it will, if sustained by the Court of Appeals, the powers of all the cities in the State, has compelled and received our most careful and deliberate consideration, in which we have been greatly aided by the able briefs of counsel for appellants and respondents. As a result of such consideration and for the reasons above stated, we are unanimously of the opinion that the alleged amendment of article 12 of the Constitution claimed to have been adopted at the general election held in November, 1923, is null and void, because of non-compliance with the prescribed requirements of article 14 of the Constitution as to the manner of proposing, submitting and adopting amendments, from which determination it follows that chapter 363 of the Laws of 1924, and the Local Laws Nos. 3, 4, 5 and 6 of the New York Local Laws of 1925, enacted in pursuance thereof, are likewise null and void.

Although apparently the contention was not made in the court below, on this appeal respondents contend as follows: "If, upon any theory, it should be held that article 12 of the Constitution was not legally adopted, still we insist that the provisions of the

City Home Rule Law, subsequently enacted in so far as they were not dependent upon that amendment, are valid, and confer full authority upon the city to establish and operate municipal buses, subject, of course, in that event, to repeal or modification by the Legislature." As to this claim or contention we are unanimously of the opinion that the city has not received from the Legislature such authority under any of the provisions of chapter 363 of the Laws of 1924. (*People ex rel. Einsfeld* v. *Murray,* 149 N. Y. 367; *Admiral Realty Co.* v. *City of New York,* 206 id. 110; *Matter of McAneny* v. *Board of Estimate,* 232 id. 377; *People ex rel. Outwater* v. *Green,* 56 id. 466; *People* v. *Richards,* 108 id. 137; *Matter of Rochester E. R. Co.,* 123 id. 351.)

The city has no private estate or interest in the public streets within its borders. While it is said to hold the title to the bed of the streets, its title is that of a trustee for the whole State. The Legislature still has, within constitutional bounds, absolute control of and power over the streets. The right or authority of the city to use the streets for the maintenance and operation of a municipal system of buses for the transportation of passengers must rest on legislation containing a clear grant of such power. (*Davis* v. *Mayor,* 14 N. Y. 506, 523; *Milhau* v. *Sharp,* 27 id. 611; *People* v. *Kerr,* Id. 188; *Beekman* v. *Third Avenue R. R. Co.,* 153 id. 144; *Potter* v. *Collis,* 156 id. 16; *Matter of Water Comrs. of White Plains,* 176 id. 239; *Wilcox* v. *McClellan,* 185 id. 9; *Village of Carthage* v. *Central N. Y. Telephone & Telegraph Co.,* Id. 448, 451; *City of New York* v. *Bryan,* 196 id. 158; *McCutcheon* v. *Terminal Station Commission,* 168 App. Div. 301.)

The city has not received such legislative authority, and its action in maintaining and operating buses on the streets of the city is, therefore, *ultra vires* and illegal. (*Schafer* v. *City of New York,* N. Y. L. J. Oct. 5, 1922; 206 App. Div. 747, 794; leave to appeal denied by Court of Appeals, July 13, 1923; *Huff* v. *City of New York,* 202 App. Div. 425; *Brooklyn City R. R. Co.* v. *Whalen,* 191 id. 737; affd., 229 N. Y. 570.)

The judgments and orders appealed from should be reversed, with costs to appellant in each action; the motions for continuance of the injunctions should be granted in each action, and the motions to dismiss the complaint in each action denied.

CLARKE, P. J., MERRELL, FINCH and MARTIN, JJ., concur.

Judgments and orders reversed, with costs to appellant in each action; motions for continuance of injunctions granted in each action, and motions to dismiss complaint in each action denied. Settle orders on notice.